285 N.J. Super. 27 (1995)
666 A.2d 549
SONS OF THUNDER, INC., PLAINTIFF-RESPONDENT,
v.
BORDEN, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 9, 1994.
Decided November 1, 1995.
*30 Before Judges MICHELS, KEEFE and HUMPHREYS.
Peter J. Pizzi argued the cause for appellant (Connell, Foley & Geiser, attorneys; Mr. Pizzi and Jeffrey Steinberg, of counsel and on the brief).
Richard L. Bazelon argued the cause for respondent (Bazelon & Less, attorneys; Mr. Bazelon, Helen Heifets and Jerrilyn G. Marston, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Defendant Borden, Inc. (Borden) appeals from a portion of a judgment of the Law Division entered on a jury verdict that awarded plaintiff Sons of Thunder, Inc., damages in the amount of $412,000 based on a breach of an implied covenant of good faith and fair dealing in terminating its contract with plaintiff and from a denial of its motion for a judgment notwithstanding the verdict. At issue, is whether an implied covenant of good faith and fair dealing under the facts of this case overrides a contractual right to terminate the subject contract without cause. We hold that it does not and, therefore, reverse the judgment entered in favor of plaintiff.
This appeal involves Borden's Snow Products Division in Cape May, New Jersey. Borden processes quahog clams for resale at its Cape May plant. Quahogs are found in the seabed twenty to forty miles offshore from Cape May in one-hundred to two-hundred feet of water. The quahog is a thick-shelled clam, which is almost impossible to open by hand. Therefore, a steam process is required to "shuck" the clams, that is, to open the shells to remove the meat. Once the meat is removed and processed, it is *31 used to make such products as clam chowder, chopped clams, clam juice, and various sauces.
In the early to mid-1980's, all of those products were manufactured at Borden's plant in Pine Point, Maine. However, the clams utilized in that manufacture were shucked, processed, chilled down, and transported to the Maine plant from Borden's processing plant in Cape May. Before that processing could occur, the clams first had to be harvested and brought to Cape May.
To harvest the clams, Borden maintained a fleet of four boats in Cape May. Additionally, Borden purchased clams from independently owned and operated boats. One of the boats owned by Borden was the Arlene Snow, which was captained by Donald R. DeMusz (DeMusz). In the early 1980's, DeMusz pressed Borden to allow him to take over the management of Borden's fleet of four boats, promising an annual savings to Borden compared to the fees charged by Eric Kirkenberg, who was then managing Borden's fleet. Finally, in May 1983, Borden entered into a charter agreement with DeMusz's corporation, Sea Labor, Inc., to manage and operate Borden's fleet.
Around this time, Borden began to move forward on a long-considered project to shuck clams at sea immediately after harvest. The advantage of shucking clams at sea was that a bigger haul of clam meat could be obtained per boat trip because the weighty and voluminous shells were discarded at sea. A boat, therefore, could stay out at sea longer, collect more clam meat than non-shuck-at-sea boats, and have that clam meat chilled and ready for transport to the Maine plant almost immediately upon docking in Cape May.
By late 1983, Borden had developed equipment to process the clam meat at sea, and was prepared to install the equipment on a boat for testing. At first, Borden attempted to install the equipment on the Arlene Snow. However, the equipment required far more room than was available on the ninety-foot-long Arlene Snow, and Borden began its search for a larger boat. Charles Wayne Booker (Booker), who was Borden's Group Operations *32 Manager in Columbus, Ohio, was in charge of the production and operation of Borden's Snow Food Products processing division. He began negotiations with DeMusz who was working closely with Borden on the shuck-at-sea project. DeMusz proposed that he would purchase a larger boat on which Borden could install the shuck-at-sea equipment. In exchange, Borden would purchase the clams harvested and processed by DeMusz at a set price. Booker saw advantages for Borden in DeMusz's proposal. First, because Borden would not have to purchase a larger boat, there would be an immediate and substantial savings in boat-purchase costs. Second, because the clam shells would be discarded at sea, Borden would avoid the environmental costs associated both with the disposal of the clam shells on land and with the related water treatment expenses incurred in the processing of the clams at the Cape May plant. Finally, Borden would also avoid the cost of drilling a new freshwater well at the Cape May plant, which would be necessary if the clams were processed at the plant and not at sea.
Borden eventually agreed to go ahead with DeMusz's proposal for the shuck-at-sea project. In January 1984, DeMusz and two partners formed Sea Work, Corp. (Sea Work). Sea Work purchased a large boat, the Baroid Bullet, which it renamed the Jessica Lori. After acquiring the Jessica Lori, Sea Work engaged a Texas shipyard to rig the boat for clamming. Borden required that the Jessica Lori be "rigged as a double rig" with two clam dredges, one of which was to be operated from the starboard side and the other from the port side of the boat. Although DeMusz objected to this double-rig arrangement because it occupied too much deck space and required additional crew members, which would increase maintenance costs, Sea Work went ahead with the project and double rigged the Jessica Lori. The total cost of purchasing and rigging the Jessica Lori was $750,000, which Sea Work financed through a bank loan.
On July 11, 1984, Borden and Sea Work entered into an "Equipment Lease" under which Borden agreed to place its *33 shucking equipment on the Jessica Lori in exchange for Sea Work's agreement to sell to Borden the clam meat that was to be harvested and processed at sea over a period of three years at a set price. At the time that the Equipment Lease was executed, both Borden and Sea Work anticipated that Borden's shuck-at-sea processing equipment would be installed on the Jessica Lori, and would be tested and operational by the end of 1984. Unfortunately, Borden's processing equipment did not function properly and required extensive redesign before the equipment could be finally installed. This work was not accomplished until the spring of 1985. In the meantime, Sea Work's Jessica Lori engaged in harvesting quahog clams as an independent supplier, selling them to Borden at the Cape May plant.
Sometime in July or August 1984, DeMusz and Booker began discussions concerning the possibility of DeMusz acquiring a second large boat. Borden wanted a second large boat under contract to assure a reliable supply of clams during bad weather when smaller boats could not venture out to sea. Additionally, if a second large boat were clamming for even a short period of time, that boat would benefit from any allocation system arising out of a then-anticipated change in the federal clam fishery rules, because any allocation of allowable clam harvest to a particular boat would be based on the boat's harvest history. A large all-weather boat would have a greater catch history. As a result, with a second large boat under contract, Borden could be guaranteed a reliable supply of raw clams even if a federal allocation system were implemented in the future.
Negotiations between DeMusz and Booker extended over the latter half of 1984. Booker reviewed the project with Herbert Southwell, Vice President and Manager of Borden's Grocery Products Division, and arranged for David Rau, Borden's Snow Products Division Accounting Manager, to work with DeMusz to calculate "how many bushels of quahogs a week Mr. DeMusz or his company would need to be able to sell to support the investment in this project." Eventually, Booker and DeMusz arrived at *34 an understanding that DeMusz would purchase a second large boat and that Borden would enter into a contract to purchase a set amount of clams harvested weekly by that boat at a set price. In that manner, Borden would be assured of a dependable supply of clams, and DeMusz would be guaranteed both a purchaser for the clams and a reliable income stream to finance the boat.
On December 20, 1984, Booker sent DeMusz a letter, stating that Borden intended to enter into a quahog supply contract with him to support the purchase of a second large boat. Booker had previously reviewed this letter with Southwell and sent a copy to Borden's legal department. Moreover, Booker was aware that DeMusz would present the letter to a bank in an effort to obtain financing for the purchase and renovation of the second boat. Upon receipt of Borden's letter, DeMusz directed his attorney to form plaintiff corporation.
In late December 1984, DeMusz drafted a one-page contract and sent it to Booker for signature. Booker reviewed the contract with Southwell and received Southwell's permission to sign it. Shortly thereafter, Booker apparently telephoned DeMusz and informed him that the contract was acceptable. On December 26, 1984, DeMusz filed plaintiff's certificate of incorporation with the New Jersey Secretary of State. DeMusz and Robert Dempsey (Dempsey), Borden's plant manager at Cape May, were listed as directors of plaintiff corporation. The stock of plaintiff-corporation was owned equally by DeMusz, Dempsey and a William Gifford (Gifford). In early January 1985, Booker signed the contract on behalf of Borden. Booker then returned the signed document to DeMusz, who, on January 15, 1985, signed it on behalf of plaintiff.
At the time Booker signed the contract, he did not know that Dempsey had an undisclosed one-third interest in the plaintiff-corporation or that Dempsey had previously made a $25,000 loan to DeMusz. According to Booker, the contract between plaintiff and Borden would never have come into existence had he been informed of Dempsey's one-third interest in plaintiff because of *35 Borden's conflict of interest rules. Dempsey, as Borden's manager at the Cape May plant, made the purchases of quahogs from independent boats. Booker testified that "absolutely it would have been a conflict of interest for Mr. Dempsey" to have any interest in plaintiff while at the same time being employed by Borden and that "it would have been a very bad thing for Robert Dempsey to have ownership interest in something that he would be controlling." Thus, there can be no question that Dempsey, as Borden's manager at the Cape May plant and being responsible for the purchase of quahogs from outside boats, violated Borden's conflict of interest rules by having an ownership interest in plaintiff.
It also appears that Booker placed trust in Dempsey and relied upon Dempsey more than any other subordinate regarding the operation of the Cape May plant. Booker testified that Dempsey told him in the presence of DeMusz that "it [the contract] was a good idea." Interestingly, Dempsey testified that plaintiff's "contract was unnecessary for [him] to get the quality clams ... needed to run the [Cape May] plant." Notwithstanding this, Dempsey admitted that he never made this fact known to Booker before the contract was negotiated and signed.
Finally, and most importantly, Booker testified that in view of Borden's conflict of interest policy that required key managers, such as himself and Dempsey, to annually sign an affirmation that they do not have an undisclosed interest in any firm supplying products to Borden, he would not have signed the contract had he known of Dempsey's one-third interest without bringing it to Mr. Southwell's attention. Southwell testified that he "absolutely" had no knowledge that "Mr. Dempsey had an interest in suppliers providing shell stock to Borden" or that "Mr. Dempsey had made loans to or a loan to Mr. DeMusz." According to Southwell, it "would have been absolutely unacceptable to [him] and [he was] sure that it would have been absolutely unacceptable to [his] superiors at any level" for Borden to enter into an "agreement *36 with a vessel-corporation owning a vessel in which Mr. Dempsey had an interest."
Dempsey admitted that in 1981, 1982 and 1983 he signed Borden's conflict of interest forms which required specific disclosure of any interest he had in any supplier to Borden. Dempsey also admitted signing one such form in 1985, and two in 1986, without disclosing to Borden his one-third interest in plaintiff. In fact, Dempsey signed a conflict of interest form on January 3, 1985, less than two weeks before plaintiff's contract with Borden was signed, and failed to disclose to Borden his interest in plaintiff. Thus, the proofs stand uncontroverted that Dempsey had a one-third interest in plaintiff, a supplier of quahogs to Borden; that notwithstanding Borden's conflict of interest policy, Dempsey did not disclose this conflict of interest to Borden; that neither Booker nor Southwell knew of Dempsey's loan to DeMusz or of Dempsey's ownership interest in plaintiff when the contract was signed; and, most importantly, that the contract would not have been entered into if Borden had known of Dempsey's undisclosed interest in plaintiff.
The full text of the contract prepared by plaintiff reads as follows:
IT IS understood and Agreed to by the parties hereto that Snow Food Products shall purchase shell stock from Sons of Thunder Corp. for a period of one (1) year at the market rate that is standardized throughout the industry. The term of this contract shall be for a period of one (1) year, after which this contract shall automatically be renewed for a period up to five years. Either party may cancel this contract by giving prior notice of said cancellation in writing Ninety (90) days prior to the effective cancellation date.
Sons of Thunder Corp. will offer for sale all shell stock that is landed to Snow Food Products with Snow Food Products having first right of refusal, but it is agreed upon that Snow Food Products will purchase at least 240 cages of ocean quahogs per week or 7,680 bushels of ocean quahogs, with the exception of annual plant shutdown and unforeseen plant shutdowns.
In accordance with the contract, Borden was to purchase from plaintiff a set quantity of quahogs per week at the market price for a term of one-year. At the end of the one-year period, the contract was to "automatically be renewed" for a five-year period unless one of the parties canceled the contract. The contract *37 could be canceled by either party "by giving prior notice of said cancellation in writing Ninety (90) days prior to the effective cancellation date." Both Booker and DeMusz testified that the initial one-year period of the contract was not to commence until plaintiff presented a boat to Borden that was ready to harvest clams. Thus, the term of the contract was not to begin immediately, but rather was to await DeMusz's procurement and rigging of a second large vessel that could harvest clams.
In March 1985, plaintiff purchased a used, 130-foot oil rig supply boat named the Draco for $35,000. Plaintiff renamed the boat the Sons of Thunder, and placed it in a shipyard in Louisiana to be refabricated and rigged as a single-stern-dredge clamboat. The shipyard apparently went bankrupt, and after a four-month delay, plaintiff engaged another shipyard in Louisiana to prepare the boat. The Sons of Thunder was completed and ready to sail by the end of February 1986, almost one year after plaintiff had purchased the vessel. The cost of refabricating and rigging the Sons of Thunder was $588,420.26 and plaintiff paid $515,000 of this sum with a bank loan and financed the balance by a personal note from DeMusz to the shipyard. The commitment for the bank loan was obtained by plaintiff in October 1985 and extended by the bank to February 1986. Booker confirmed to the bank's loan officer that Borden had a contract with plaintiff. In February 1986, the Sons of Thunder sailed to Cape May where it underwent sea trials, and in April 1986 the Sons of Thunder began harvesting quahog clams. According to all parties, at this time the one-year period of the contract commenced.
During this time, Sea Work's Jessica Lori, was harvesting clams and Borden was redesigning its shuck-at-sea processing equipment. In April 1985, the redesigned equipment was installed on the Jessica Lori However, following sea trials, the equipment again proved defective. Borden then spent about five months trying to correct the problems on the Jessica Lori, thus preventing the boat from harvesting clams and meeting the fixed costs that were entailed in the boat's ownership and operation.
*38 In the summer of 1985, DeMusz informed Booker that Sea Work was "out of money" and might be bankrupted unless something was done. According to Booker, Borden recognized that it had to somehow aid DeMusz with "his ongoing overhead expenses while we were basically preventing him from fishing with that boat." Booker and Southwell, therefore, arranged an advance of up to $125,000 from Borden to Sea Work to cover the Jessica Lori's overhead costs. Sea Work was to repay the advance later at the rate of ten cents per pound of clam meat harvested and processed by the Jessica Lori This agreement was embodied in several separate written acknowledgements executed by DeMusz as president of Sea Work. Booker testified that the $125,000 which was advanced to Sea Work was not to bear interest and that DeMusz was not to be personally liable for the monies advanced. According to Booker, when he and Southwell arranged for the advance, they anticipated that Borden's shuck-at-sea processing equipment would soon be successfully operating on the Jessica Lori. However, Borden's equipment did not function as planned and there was not enough room for it on the double-side-rigged Jessica Lori. Consequently, in September 1985, Borden's equipment was removed so that Borden's engineers could redesign it. The Jessica Lori then harvested clams for Borden until February 1986, when it was decided that a shipyard would be engaged to convert the Jessica Lori from a double-rigged to a single, stern-rigged boat to better accommodate Borden's equipment. In February 1986, Sea Work placed the Jessica Lori in a shipyard in Baltimore, Maryland to make the conversion. The cost of converting the Jessica Lori was about $350,000 and DeMusz, on behalf of Sea Work, attempted to finance this amount through a bank loan. In July of 1986, Sea Work obtained a $150,000 loan to pay for the re-rigging. However, because the bank's loan would only partially cover the Jessica Lori's re-rigging costs, DeMusz arranged for plaintiff to borrow $200,000, and to loan that amount to Sea Work. This loan was closed in November of 1986. Plaintiff was also required by the bank to guarantee all loans made to Sea Work. Thus, plaintiff effectively guaranteed the more than $750,000 that *39 was then owed by Sea Work for work that had been done on the Jessica Lori. In order to obtain the dual corporate financing for the Jessica Lori's conversion, the bank also required that there be identity of shareholders in plaintiff and Sea Work. To achieve this, Gifford and Dempsey, two of the three shareholders in plaintiff, bought out two of the other three shareholders in Sea Work. As a result, DeMusz, Gifford, and Dempsey became the sole shareholders of both plaintiff and Sea Work.
The Jessica Lori's conversion to a stern-rigged clamboat was completed by July 1986. Thereafter, the boat satisfactorily underwent sea trials and waited for Borden to finish its refabrication of the shuck-at-sea processing equipment. The equipment was installed on the boat during September and October of 1986. The equipment was tested at sea and performed quite well with no major problems. By November 1986, the Jessica Lori, utilizing Borden's shuck-at-sea processing equipment, was harvesting and processing clam meat for Borden.
In April 1986, as noted previously, plaintiff's Sons of Thunder began harvesting clams for Borden. On or about May 1, 1986, William Gallant (Gallant) took over Booker's position at Borden, after Booker was terminated as a result of a corporate reorganization and downsizing. It soon became apparent to DeMusz that the Sons of Thunder was not being sent on enough trips by Borden to harvest the number of clams agreed upon under the contract. It is undisputed that shortly after Gallant replaced Booker in early May 1986, DeMusz complained to Gallant that Borden was not purchasing the quota of clams allocated to plaintiff under the contract.[1] According to DeMusz, Gallant stated that he *40 had been unaware of the contract between plaintiff and Borden, and that he was not going to honor the contract. When DeMusz pointed out that the contract had been approved by Booker and Southwell, Gallant informed DeMusz that Booker was no longer employed by Borden. DeMusz could not understand Gallant's attitude, testifying:
I couldn't understand it. I don't know why he had that attitude, but he just said he wasn't going to honor the contract. I vigorously complained to him trying to reason, I mean the company needed the clams, I couldn't understand why he just took a stand that he didn't want to honor it. It didn't make any sense.
Neither Southwell, who retired in May 1986, nor Robert Culver (Culver), who replaced Southwell in August 1986 and became Gallant's supervisor, increased Borden's utilization of Sons of Thunder. The result was that Borden was not purchasing the 7,680 bushels of clams per week required by the contract. In spite of this, and given Gallant's clear and unambiguous statement to DeMusz in May 1986 that Borden would not honor the contract, DeMusz continued to process the $200,000 loan on behalf of plaintiff to pay off the remainder of the Jessica Lori's re-rigging costs, and closed the loan in November 1986.
In September 1986, Borden acquired Doxsee Seafood Products Corporation, which had a clam processing plant in Lewes, Delaware. Robert Nicholson (Nicholson), Doxsee's Delaware plant manager, became the manager of Borden's plant in Cape May, replacing Dempsey. Dempsey was demoted to the position of boat manager. DeMusz approached Nicholson and told him about the clam-supply contract between Borden and plaintiff. Nicholson contacted Gallant, and thereafter Nicholson informed DeMusz, as had Gallant previously, that Borden would not honor the contract. The situation soon worsened for the Sons of Thunder, which was sent out to harvest clams for Borden only in foul weather.
In mid-November 1986, Dempsey apparently had a conversation with Nicholson, in which Nicholson purportedly stated that he *41 wanted to make money through kickbacks, shorting clam-meat yields, or changing cages. Dempsey told Nicholson that he was a part-owner of the Sons of Thunder and that he would have nothing to do with such illegal schemes. As a result of Dempsey's revealing his ownership interest in plaintiff, Borden began an investigation to determine whether Dempsey had violated Borden's conflict-of-interest policy by failing to disclose his ownership interest in plaintiff. During the course of that investigation, Borden also learned of Dempsey's one-third interest in Sea Work, which owned the Jessica Lori and was also supplying clam meat to Borden. As a result of the investigation, Dempsey was terminated by Borden on February 25, 1987.
A day or two after Dempsey was terminated, DeMusz contacted Gallant and told him about Nicholson's reputation for demanding kickbacks from independent boat operators. Gallant apparently disbelieved DeMusz and informed Nicholson of DeMusz's allegations. Nicholson denied the allegations and then reprimanded DeMusz for informing on him. Over the next two months, Borden purchased fewer and fewer clams from the Sons of Thunder, and plaintiff began to fall behind in meeting the boat's expenses.
On May 8, 1987, Borden gave plaintiff ninety-days written notice that it was terminating the contract. The termination letter read: "This letter is to advise you that effective ninety (90) days from the date of receipt of this letter, Borden terminates the Purchase Agreement dated January 15, 1985 by and between Snow Food Products, division of Borden, Inc. and Sons of Thunder Corp." According to Culver, the contract was terminated because Borden saw no need "to maintain that type of relationship with the boat [Sons of Thunder] because of the clams, that we really didn't need to get the clams from that specific boat," and also because the plant manager was terminated for a conflict of interest in that he had an ownership interest in the boat. Furthermore, Culver testified that "from a relationship standpoint, it [DeMusz] wasn't really someone who I felt that Borden really needed to be doing any business with unless it was absolutely necessary. And in this *42 case, it was not absolutely necessary." On the same day that Borden terminated plaintiff's contract, it also gave notice of termination of the Sea Work contract involving the Jessica Lori. Within two weeks, Borden removed the clam-dredging cages from the Sons of Thunder.
Gallant approached DeMusz and proposed that Sea Work's Jessica Lori could continue to harvest clams for Borden if DeMusz were the sole owner of the vessel. In or about June 1987, DeMusz purchased Gifford's and Dempsey's stock in Sea Work and Gifford and Dempsey purchased DeMusz's stock in plaintiff. Gifford and Dempsey, who now were the sole stockholders of plaintiff, attempted to find a processor in New Jersey for any clams that Sons of Thunder could harvest. Unable to do so, they moved the boat to Chincoteague, Virginia, where they supplied clams to a small processor. DeMusz, who was now the sole stockholder of Sea Work, decided to remove Borden's shuck-at-sea processing equipment from the Jessica Lori to eliminate the rental fees for that equipment.
Gallant again approached DeMusz about signing a personal note for the $125,000 advance made by Borden to Sea Work, and on July 28, 1987, even though Borden had terminated the contract with plaintiff and Sea Work, DeMusz signed a personal guarantee. Thereafter, Gallant told Nicholson that the Jessica Lori had "first priority" over the other independent boats that supplied clams to Borden. According to DeMusz, Nicholson demanded a fifteen-cents-per-bushel kickback on all clams harvested by the Jessica Lori and supplied to Borden. DeMusz paid. However, the Jessica Lori's overhead was simply too large to be supported without a supply contract. DeMusz, therefore, moved the Jessica Lori to Virginia and later to New Bedford, Massachusetts, but met with no success at either location. In September 1987, Borden fired Nicholson for soliciting and receiving kickbacks from clam supply boats. In October 1988, DeMusz gave up his stock ownership interest in Sea Work and the Jessica Lori.
*43 Plaintiff thereafter instituted this breach of contract action against Borden. Plaintiff claimed that Borden breached both the express terms of the January 15, 1985 contract and the implied covenant of good faith and fair dealing. Plaintiff sought damages of (1) $150,000 for Borden's failure to purchase the quahog clams in the minimum quantity at the market price in accordance with the contract; (2) $950,000 for Borden's failure to purchase quahogs for the period from April 7, 1986 until the Sons of Thunder was sold in December 1989; and (3) $800,000 for the diminished market value of Sons of Thunder.
At the conclusion of the proofs, the trial court submitted the case to the jury on both theories advanced by plaintiff, to wit, that Borden breached its obligations to purchase a set quantity of quahog clams and to pay the market price for those clams in accordance with the express terms of the contract of January 15, 1985 and that Borden breached its implied covenant of good faith and fair dealing by terminating the contract by its letter of May 8, 1987. Plaintiff claimed that the contract was for a one-year period during which either party could give a ninety-day notice of termination and that, thereafter, if notice was not given, the contract was to extend for five years. Borden, on the other hand, claimed that it had the right to terminate the contract on ninety-days written notice at any time. The trial court, finding that the termination provision of the contract was ambiguous, submitted the issues to the jury, instructing the jury to determine whether Borden breached the express terms of the contract as well as the implied covenant of good faith and fair dealing in terminating the contract.
The trial court instructed the jury as to the damage elements: first, damages for the period from April 7, 1986, when the Sons of Thunder commenced fishing for Borden until August 8, 1987, when the contract was terminated, based on Borden's failure to purchase the minimum quantity of quahog clams at the market price in accordance with the contract; second, damages for lost sales to Borden for the full five-year period of the contract; and *44 third, damages for the loss of its federal quahog allocation based on catch history. Plaintiff contended that it was foreseeable when the parties entered into the contract on January 15, 1985, that there was going to be a quahog allocation based on a vessel's catch history, and that because of Borden's breach of the contract, the catch history of the Sons of Thunder would be low and a higher allocation would be lost, with resultant damages.
At the conclusion of the charge, the trial court submitted the following interrogatories which the jury answered:
1.(a) Do you find that between April 7, 1986 and August 8, 1987 defendant, Borden, Inc., breached the Contract with plaintiff, Sons of Thunder, Inc., by not purchasing the minimum quantity of quahogs specified in the Contract, 7,680 bushels per week, and/or by not paying the market price for such quahogs?
 YES X NO ___
 Vote 5-1
If your answer to question # 1(a) is "No", proceed directly to question # 2; if your answer is "Yes", proceed to answer question # 1(b).
1.(b) What do you find to be the amount of damages, if any, incurred by plaintiff, Sons of Thunder, Inc., as a result of this (these) breach(es) of contract?
 $326,292 
 Vote 6-0
2. Do you find that defendant, Borden, Inc., breached the Contract with plaintiff, Sons of Thunder, Inc., by terminating the Contract by its letter of May 8, 1987?
 YES ___ NO X 
 Vote 5-1
3. Do you find that defendant, Borden, Inc., breached its obligation of good faith and fair dealing to plaintiff, Sons of Thunder, Inc., in terminating the Contract by its letter of May 8, 1987?
 YES X NO ___
 Vote 6-0

*45 If you have answered "No" to BOTH questions # 2 and # 3, cease your deliberations and advise the jury attendant that you have reached your verdict; if you have answered "Yes" to question # 2 and/or # 3, proceed to answer question # 4.
4. What sum of money, if any, expressed in a lump sum, will adequately and justly compensate the plaintiff, Sons of Thunder, Inc., for:
a) Damages as a result of lost sales to Borden, Inc., if any
 $412,000 
 Vote 5-1
b) Damages as a result of lost sales to other processors, if any
 $0
 Vote 6-0
5. Do you find that it was foreseeable on January 15, 1985, that the Federal Government would institute a quahog allocation system based upon a vessel's catch history and that plaintiff would suffer a loss of quahog allocation in the event of a breach by Borden, Inc., of the January 15, 1985 Contract?
 YES ___ NO X 
 Vote 5-1
6. If you have answered "No" to question #5, cease your deliberations and advise the jury attendant that you have reached a verdict; if you have answered "Yes" to question # 5, proceed to answer question # 6.
Set forth the lost quahog allocation damages, if any, incurred by plaintiff, Sons of Thunder, Inc.,
 $ ____
 Vote ____
During deliberations, the jury asked the following question: "Your Honor, if we were to award money for lost profits from sales, can we also award damages based on breach of good faith and fair dealing for the same time period?" The trial court found that the jury was actually inquiring as to whether it could award damages for the period after the ninety days following the termination *46 letter of May 7, 1987, that is, after August 7, 1987. The trial court concluded, therefore, with the concurrence of all counsel, that the jury's question in effect involved the construction of Interrogatory No. 4, and, instructed the jury that damages could be awarded in answer to Interrogatory No. 4 for a separate period of time after August 8, 1987. The trial court specifically instructed the jury in answering its question as follows:
With respect to your request, and you're talking about during that ninety-day time period? Any and all losses up to August 8th, 1987, which would be that ninety-day time period, would be answered in 1-B, and the lost sales in 4-A and B would be after August 8th of 1987. Okay? These lost sales are after the August 8th because number 1-A and 1-B simply talk about all the way up to August 8th, '87, which is the end of the ninety-day time period; that puts one category. And then the balance of that is everything that plaintiff is claiming after August 8th, '87....
Thereafter, as appears from the verdict form, the jury found, by a five-one vote, that between August 7, 1986 and August 8, 1987, Borden breached its contract with plaintiff by not purchasing the minimum quantity of quahogs and by not paying the market price for such quahogs as required by the contract and, by an unanimous vote, awarded plaintiff damages for that period in the sum of $326,292. The jury also found, by a five-one vote, that Borden did not breach its contract with plaintiff by terminating the contract by its letter of May 8, 1987. Notwithstanding this finding, the jury further found, by a unanimous vote, that Borden had breached its implied obligation of good faith and fair dealing to plaintiff in terminating the contract by its letter of May 8, 1987 and, by a five-one vote, awarded plaintiff damages for lost sales to Borden (after August 7, 1987) in the amount of $412,000. Finally, the jury found, by a five-one vote, that it was not foreseeable on January 15, 1985 that the federal government would institute a quahog allocation system based upon a vessel's catch history and that plaintiff would suffer a loss of quahog allocation in the event of a breach by Borden of the January 15, 1985 contract. Borden's motion for a judgment of no cause for action notwithstanding the liability verdict that awarded plaintiff $412,000 based on a theory of breach of an implied covenant of good faith and fair dealing was denied. Borden appealed and plaintiff cross-appealed.
*47 While this matter was pending on appeal, plaintiff and Borden entered into a stipulation pursuant to which Borden agreed, among other things, to immediately satisfy the $326,292 judgment in favor of plaintiff based on Borden's failure to purchase the minimum number of quahog clams at the market price in accordance with the contract prior to its termination on August 8, 1987 and plaintiff agreed to withdraw its cross-appeal. Thus, the only issues remaining on this appeal relate to the jury's verdict of liability and the damage award of $412,000 based on the jury's finding that Borden breached the covenant of good faith and fair dealing to plaintiff in terminating the contract by its letter of May 8, 1987.
Borden seeks a reversal of the portion of the judgment that awarded plaintiff $412,000 in damages, contending that (1) an implied covenant of good faith and fair dealing cannot override an express contract right to terminate a contract, particularly, where, as here, the jury expressly found that Borden did not breach its contract with plaintiff by terminating it as of August 8, 1987, and (2) the $412,000 damage award cannot be sustained because plaintiff cannot recover more than the value of the contract prior to its termination on August 8, 1987.
The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them. Jacobs v. Great Pacific Century Corp., 104 N.J. 580, 582, 518 A.2d 223 (1986); Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301, 96 A.2d 652 (1953); Casriel v. King, 2 N.J. 45, 50, 65 A.2d 514 (1949). To this end, the language used must be interpreted "`in accord with justice and common sense.'" Krosnowski v. Krosnowski, 22 N.J. 376, 387, 126 A.2d 182 (1956) (citation omitted). As our Supreme Court noted in Tessmar v. Grosner, 23 N.J. 193, 201, 128 A.2d 467 (1957):
In the quest for the common intention of the parties to a contract the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain. An agreement must be construed in the context of the circumstances under which it was entered into and it must be accorded a rational meaning in keeping with the express general purpose. Cameron v. International, *48 etc., Union No. 384. 118 N.J. Eq. 11 [176 A. 692] (E. & A. 1935); Mantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379 [55 A.2d 250] (E. & A. 1947); Heuer v. Rubin, 1 N.J. 251 [62 A.2d 812] (1949); Casriel v. King, 2 N.J. 45 [65 A.2d 514] (1949); Owens v. Press Publishing Co., 20 N.J. 537, 543 [120 A.2d 442] (1956).
See also Jacobs, supra, 104 N.J. at 582, 518 A.2d 223; Anthony L. Petters Diner, Inc. v. Stellakis, 202 N.J. Super. 11, 28, 493 A.2d 1261 (App.Div. 1985); Bruenn v. Switlik, 185 N.J. Super. 97, 105, 447 A.2d 583 (App.Div.), certif. denied, 91 N.J. 536, 453 A.2d 857 (1982); Ins. Co. of State of Pa. v. Palmieri, 81 N.J. Super. 170, 179, 195 A.2d 205 (App.Div. 1963), certif. denied, 41 N.J. 389, 197 A.2d 15 (1964); Union County U-Drive It v. Blomeley, 48 N.J. Super. 252, 256, 137 A.2d 428 (App.Div. 1958).
Also, where an ambiguity appears in a written agreement, the writing is to be strictly construed against the party preparing it. See In re Miller, 90 N.J. 210, 221, 447 A.2d 549 (1982); Liqui-Box Corp. v. Estate of Elkman, 238 N.J. Super. 588, 599, 570 A.2d 472 (App.Div. 1990). This rule of construction is somewhat tempered by the principle that although "a contractual provision should generally be construed narrowly against the drafter, [citation omitted], the construction should be sensible and in conformity with the expressed intent of the parties." Broadway Maintenance Corp. v. Rutgers, 90 N.J. 253, 271, 447 A.2d 906 (1982). In this regard,
Even where the intention is doubtful or obscure, the most fair and reasonable construction, imputing the least hardship on either of the contracting parties, should be adopted [citation omitted], so that neither will have an unfair or unreasonable advantage over the other.
[Tessmar, supra, 23 N.J. at 201, 128 A.2d 467.]
However, "[w]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction" and the courts must enforce those terms as written. Levison v. Weintraub, 215 N.J. Super. 273, 276, 521 A.2d 909 (App.Div.), certif. denied, 107 N.J. 650, 527 A.2d 470 (1987). See also Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43, 161 A.2d 717 (1960). The court has no right "to rewrite the contract merely because one might conclude that it might well have been functionally desirable *49 to draft it differently." Brick Tp. Mun. Util. Auth. v. Diversified R.B. & T., 171 N.J. Super. 397, 402, 409 A.2d 806 (App.Div. 1979). Nor may the courts remake a contract better than the parties themselves have seen fit to enter into, or to alter it for the benefit of one party to the detriment of the other. James v. Federal Insurance Co., 5 N.J. 21, 24, 73 A.2d 720 (1950).
Viewed in light of these settled principles, and the jury's specific finding that Borden did not breach its contract with plaintiff by terminating the contract by its letter of May 8, 1987, the $412,000 judgment in favor of plaintiff based on the theory that Borden breached its obligation of good faith and fair dealing cannot stand. When the jury found that Borden did not breach the contract by terminating the contract by its letter of May 8, 1987, the jury's inquiry should have ended. The trial court erred in failing to so instruct the jury.
Furthermore, the right of Borden to terminate the contract on ninety-days notice in accordance with its express terms cannot be overridden or eliminated by an implied covenant of good faith and fair dealing. We recognize the underlying contract law principle that "there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing." 5 Williston on Contracts  670 (Jaeger, 3rd ed. 1961). See also 2 Restatement (Second) of Contracts  205 (1981). In fact, our Supreme Court has explicitly held that such a covenant is implied in every contract, Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182, 425 A.2d 1057 (1981), and that the covenant applies to the parties' performances and their enforcement of the contract. Pickett v. Lloyd's, 131 N.J. 457, 467, 621 A.2d 445 (1993). Similarly, N.J.S.A 12A:1-203 of the Uniform Commercial Code (U.C.C.), expressly provides that "[e]very contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." Further, the U.C.C. *50 defines "good faith" as "honesty in fact in the conduct or transaction concerned." N.J.S.A. 12A:1-201(19).
However, an implied covenant of good faith and fair dealing cannot override or eliminate a party's right to terminate a contract in accordance with its express provisions. The reason for this is readily apparent; an implied obligation of good faith and fair dealing does not and cannot "alter the terms of a written contract." Rudbart v. North Jersey District Water Supply Comm'n, 127 N.J. 344, 366, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992); Glenfed Financial v. Penick Corp., 276 N.J. Super. 163, 175, 647 A.2d 852 (App.Div. 1994), certif. denied, 139 N.J. 442, 655 A.2d 444 (1995). Consequently, an implied covenant should not have been invoked to bar Borden from exercising its right to terminate the contact on ninety-days notice. Certainly such a covenant cannot be implied in the circumstances of this case to compel Borden to purchase quahog clams from plaintiff for the entire five-year term of the contract, or until plaintiff paid off its loan on the Sons of Thunder and its guarantee of Sea Work's loans on the Jessica Lori.
Persuasive authority that has considered this issue both under common law principles and under the U.C.C. have reached similar conclusions. For example, in Karl's Sales & Serv. v. Gimbel Bros., 249 N.J. Super. 487, 592 A.2d 647 (App.Div.), certif. denied, 127 N.J. 548, 606 A.2d 362 (1991), we refused to find that an implied covenant barred Gimbel Brothers, Inc. (Gimbel) from terminating its business entity without incurring liability to Karl's Sales & Service, Inc. (Karl's). There, Karl's, an appliance ÔÇö department store licensee, sued Gimbel, a department store licensor, after Gimbel elected to close six department stores. As part of the closures, Gimbel terminated its leases with Karl's pursuant to an express and unambiguous provision in the lease agreements, which allowed lease termination if a store were closed. The trial court entered judgment in favor of Karl's, implicitly concluding that there was an implied covenant that Gimbel would continue in business. We reversed, holding that *51 Gimbel had an absolute right under the subject leases to close the stores and that there was no legal or factual basis to imply a good faith covenant that Gimbel would continue in business. In reaching this conclusion, we emphasized:
The law is clear that where the right to terminate a contract is absolute under the wording in an agreement, the motive of a party in terminating such an agreement is irrelevant to the question of whether the termination is effective. Triangle Min. Co. v. Stauffer Chemical Co., 753 F.2d 734, 740 (9th Cir. 1985); Blalock Machinery v. Iowa Mfg. Co., 576 F. Supp., 774, 777-78 (N.D.Ga. 1983); Augusta Medical Complex, Inc. v. Blue Cross of Kansas, Inc., 227 Kan. 469, 608 P.2d 890, 896 (1980) (citing to Zaidan v. Borg-Warner Corporation, 228 F. Supp. 669, 671 (E.D.Pa. 1964), aff'd, 341 F.2d 391 (3rd Cir.1965); Kraus v. General Motors Corporation, 120 F.2d 109 (2nd Cir.1941)). See Smith v. Price's Creameries, 98 N.M. 541 [546], 650 P.2d 825, 830 (1982). Therefore, Gimbel could close any or all of its stores for any reason. Here, Gimbel closed the six stores covered by the licensing agreements and gave Karl's the notice required by the agreements. Gimbel cannot legally be held liable to Karl's for any claimed damages ensuing out of the license terminations. [Id. at 495, 592 A.2d 647.]
In Custom Com. Eng. v. E.F. Johnson Co., 269 N.J. Super. 531, 542, 636 A.2d 80 (App.Div. 1993), we again recognized that where "the right `to terminate a contract is absolute under the wording in an agreement, the motive of a party in terminating such an agreement, is irrelevant to the question of whether the termination is effective.'" (citation omitted). This holding is consistent with the generally accepted principle that "[w]hen a party has the right to terminate a contract, no money damages can be recovered on the ground that the termination was made in bad faith." 1 Ronald Anderson, Uniform Commercial Code,  1-203:11 (3rd Ed. 1981).
Similarly, in Blalock Machinery v. Iowa Mfg. Co., 576 F. Supp. 774, 777-78 (N.D.Ga. 1983), the Federal District Court rejected a plaintiff's claim that a defendant's motion for summary judgment should be denied where plaintiff argued both that genuine issues of material fact existed as to whether or not the termination of the contract was made in good faith and that every contract or duty within the U.C.C. imposes an obligation of good faith in its performance or enforcement. The Federal District court stated:
The court recognizes that the good faith obligation of the UCC has been adopted by Iowa, see lowa Code Ann.  554.1203, and is applicable to distributorship *52 contracts, however, the parties have not cited and the court has not found any cases applying Iowa law that hold that the good faith obligation overrides the express terms of the contract. In the absence of any authority, the court, in agreement with the Fifth Circuit in Corenswet [,Inc. v. Amana Refrigeration, Inc., 594 F.2d 129 (5th Cir. 1979)], is not persuaded that the section 1-203 good faith obligation can be used to override or strike express contract terms. Corenswet, supra, at 138. In other words, the court declines to conclude that the UCC prohibits arbitrary termination of distributorship contracts. The express terms of the contract state that either party may terminate the contract at any time. There is no specific language in the termination clause which states that such termination may only be made with cause. Absent such language, it is logically inferred and may be concluded that either party may terminate the contract at any time without cause, and the court believes the parties to have "understood" the termination clause to mean such. Therefore, given the express terms of the contract, the motives of the defendant in terminating the plaintiff are irrelevant. See Augusta Medical Complex v. Blue Cross, supra.

The court believes the statement in Corenswet regarding the termination of contracts without cause and the lack of good faith to be applicable to the instant case:
The question these cases present is whether public policy forbids enforcement of a contract clause permitting unilateral termination without cause. Since a termination without cause will almost always be characterizable as a "bad faith" termination, focus on the terminating party's state of mind will always result in the invalidation of unrestricted termination clauses. We seriously doubt, however, that public policy frowns on any and all contract clauses permitting termination without cause. Such clauses can have the salutary relief of permitting parties to end a soured relationship without consequent litigation.
594 F.2d at 138. Furthermore, given the fact that either party had the power to unilaterally terminate the contract without cause, it cannot be said that the plaintiff could not have done the same as the defendant and terminated the contract for whatever reason or for no reason.
The court in Corenswet concluded that "the Code does not ipso facto bar unilateral arbitrary terminations of distributorship agreements, and that Iowa's adoption of the Code therefore left undisturbed the law reflected" in the decision of Des Moines Blue Ribbon Distributors v. Drewrys, Ltd., supra [256 Iowa 899, 129 N.W.2d 731 (1964)]. The court finds the holding of Corenswet to be applicable and controlling the case sub judice and concludes that the defendant was entitled to terminate the contract without cause upon 30 days notice, that proper notice was given, and that the good faith obligation of the Code does not override the express terms of the contract. Accordingly, the termination is effective.
See also General Aviation, Inc. v. Cessna Aircraft Co., 915 F.2d 1038, 1041-42 (6th Cir.1990); Grand Light & Supply Co., Inc. v. Honeywell, Inc., 771 F.2d 672, 679 (2d Cir.1985); Triangle Min. Co. v. Stauffer Chemical Co., 753 F.2d 734, 740-41 (9th Cir.1985); Cardinal Stone Co., Inc. v. Rival Mfg. Co., 669 F.2d 395, 396 (6th *53 Cir.1982); Corenswet, Inc. v. Amana Refrigeration, Inc., 594 F.2d 129, 138 (5th Cir.), cert. denied, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979); Flight Concepts Ltd. Partnership v. Boeing Co., 819 F. Supp. 1535, 1550-51 (D.Kan. 1993), aff'd, 38 F.3d 1152 (10th Cir.1994); Frank Lyon Co. v. Maytag Corp., 715 F. Supp. 922, 924 (E.D.Ark. 1989); Highway Equip. Co. v. Caterpillar, Inc., 707 F. Supp. 954, 958 (S.D.Ohio 1989), aff'd, 908 F.2d 60 (6th Cir.1990); Borbely v. Nationwide Mut. Ins. Co., 547 F. Supp. 959, 975 (D.N.J. 1981).
Here, the contract granted both plaintiff and Borden the power to unilaterally terminate the contract without cause. They were not bound to continue the contract if either party chose not to do so, no matter what the reason or motive underlying that decision. Moreover, had plaintiff wanted to protect itself against the risk that the venture would not be profitable or that Borden would exercise its right to terminate the contract before the full five-year term expired or before it had paid off its loan on the Sons of Thunder or its guarantee of Sea Work's loans on the Jessica Lori, it should have bargained for a contract that would have given it such protection.
The covenant of good faith and fair dealing cannot be implied to alter the termination provisions of the contract or to protect any expectation on the part of plaintiff that the contract would not be terminated before the full five-year term expired or before plaintiff had paid off its loan on the Sons of Thunder and its guarantee of Sea Work's loans on the Jessica Lori. To imply as an element of the covenant of good faith and fair dealing that Borden would not terminate the contract until these events occurred, contravenes the plain terms of the contract, creates confusion and uncertainty in the business relationship between the parties and violates the fundamentally sound principles of contract law discussed above.
Beyond this, there is no proof in this record that Borden's termination of the contract was done in bad faith, that is, with a lack of "honesty in fact." On the contrary, entirely apart from the *54 fact that the contract empowered Borden to unilaterally terminate it without cause and that the jury in effect confirmed this right when it found that Borden did not breach the contract by terminating it on ninety-days notice, Borden had a right to terminate this contract in light of its policy against conflicts of interest. The proofs stand uncontroverted that Dempsey was a director and a one-third stockholder of plaintiff. It is also uncontroverted that Dempsey was Borden's Cape May plant manager in charge of purchasing quahog clams from plaintiff and from other boats. Dempsey's stock ownership interest in plaintiff at the time that plaintiff entered into the contract and during the time that it performed the contract violated Borden's policy against conflicts of interest. In fact, the proofs showed that Borden would not have entered into the contract in the first place if Borden or Southwell had known that Dempsey had a one-third interest in plaintiff. Thus, when Borden learned of Dempsey's stock ownership in plaintiff in violation of its policy against conflicts of interest, Borden had a right to terminate the contract, and Culver so testified.
Furthermore, if "honesty in fact" is lacking in this transaction, it arose out of plaintiff's dealings with Borden. Plaintiff plainly violated its implied obligation of good faith and fair dealing owed to Borden by entering into the contract with Borden to sell the quahog clams knowing that one of its directors and principle stockholders was also Borden's manager in charge of purchasing such clams. Thus, when the jury found that Borden did not breach its contract by terminating it on ninety-days notice, the trial court should not have submitted the issue of Borden's alleged breach of the implied covenant of good faith and fair dealing.
Finally, we emphasize that Bak-A-Lum Corp. v. Alcoa Building Prod., 69 N.J. 123, 351 A.2d 349 (1976), a case relied upon by plaintiff both on appeal and at trial, is distinguishable from this matter and does not compel a result contrary to that which we now reach. In Bak-A-Lum, a distributor, Bak-A-Lum, entered into an oral agreement with a manufacturer of aluminum siding, *55 Alcoa, to be its exclusive distributor in northern New Jersey. Id. at 127-28, 351 A.2d 349. Despite Bak-A-Lum's satisfactory performance, Alcoa decided to terminate the exclusivity agreement but failed to inform Bak-A-Lum of its decision until several months later. Ibid. During the interim, Alcoa actively concealed its decision, while at the same time encouraging Bak-A-Lum to enter into a costly five-year lease for expanded warehouse facilities as well as purchasing additional inventory. Ibid. Such conduct was deemed to violate the covenant of good faith and fair dealing. In so holding, our Supreme Court emphasized that Alcoa's:
selfish withholding from plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of dealing in good faith ... Id. at 130, 351 A.2d 349.
Unlike Alcoa, at no time did Borden actively conceal its decision to not honor the contract or to not buy the quantity of clams from plaintiff required by the contract. On the contrary, within several weeks of the commencement of the contract between plaintiff and Borden and after Gallant replaced Booker, Gallant plainly and unambiguously told DeMusz in early May 1986 that Borden would not honor the contract and would not purchase from plaintiff the quantity of clams required by the contract. In fact, at the time that Gallant so informed DeMusz, DeMusz knew that Borden had not been purchasing the quantity of clams required by the contract. Borden's failure to purchase the required amount of clams was of such concern to DeMusz that he met with Gallant in Maine in early May 1986 to discuss the problem. It was then that DeMusz informed Gallant of Borden's contract with plaintiff and Gallant told DeMusz that he did not know of it and would not honor it. While Gallant knew that DeMusz was seeking to obtain a bank loan on behalf of Sea Labor, Inc. to pay off Sea Work's debt for re-rigging the Jessica Lori and in early May 1986 signed Sea Labor, Inc.'s proposal to the bank that he had "read the proposals ... [and] understood and acknowledged same", he never misled DeMusz or plaintiff concerning his intention not to purchase *56 the 7,680 bushels of clams per week required by the contract from plaintiff.[2] In fact, Gallant testified that when he told this to DeMusz at the May meeting in Maine, DeMusz stated "that [it was] all right" and that "he [DeMusz] would be able to sell [the clams] to someone." This testimony stands uncontroverted.
Moreover, after the May meeting, with the exception of one week when Borden purchased 8,076 bushels of clams, Borden did not buy the required 7,680 bushels of clams per week from plaintiff, and this situation continued throughout the life of the contract even up until notice of termination was given in May 1987. Nevertheless, DeMusz continued to seek the bank loan to pay for the remainder of the re-rigging costs of Sea Work's Jessica Lori and in November 1986 finally arranged for plaintiff to borrow $200,000 for that purpose.
Hence, in contrast to the situation in Bak-A-Lum, Borden did not act in a surreptitious fashion, but rather openly stated its intention not to honor the contract. Since the proofs were uncontroverted that DeMusz was expressly told by Gallant in early May of 1986 that the contract between plaintiff and Borden to purchase 7,680 bushels of clams per week would not be honored and in fact was not being honored when DeMusz first sought and finally closed the bank loan five months later in November of 1986, there was no basis in fact or in law to hold that Borden breached an implied covenant of good faith and fair dealing. Certainly there was no reasonable basis for DeMusz to believe that Borden would either comply with the terms of its contract with plaintiff or continue it long enough for plaintiff to pay off the $200,000 loan.
Borden's failure to purchase the quantity of clams at the price agreed upon as required by its contract with plaintiff unquestionably *57 constituted a breach of that contract for which plaintiff was entitled to recover damages. The jury awarded plaintiff damages in the sum of $326,292 for that breach. However, Borden's breach of contract does not provide a legal basis to award plaintiff additional damages under a theory of a breach of an implied covenant of good faith and fair dealing. Although we do not applaud Borden's commercial practices, a reasonable jury could not reasonably find that Borden was "dishonest in fact" in dealing with plaintiff. Therefore, on this record, there was no legal or factual basis to submit to the jury plaintiff's damage claims based on breach of an implied covenant of good faith and fair dealing that would justify the additional $412,000 damage award.
Our dissenting colleague attempts to depict the dispute here as one between a giant corporation and an unsophisticated clam fisherman. In fact the record reveals that DeMusz was quite knowledgeable in business matters. It was DeMusz who sought out Borden and made the proposal for the shuck-at-sea vessel later known as the Jessica Lori, and it was DeMusz who decided to form separate corporations for the operation of the Jessica Lori and the Sons of Thunder. DeMusz used an attorney of his choosing for that purpose and other business matters. DeMusz testified that he drafted the Sons of Thunder contract, and that either he or his attorney's secretary typed it. He simply decided not to use his attorney to draft or review the contract because he did not want to pay a fee. It was DeMusz, not Borden, who chose to give "either" party the right to terminate the contract on ninety-days notice. DeMusz candidly admitted that the contract "[s]aid what I wanted to do...." He never maintained that Borden drove a hard bargain when it came to the termination provision, or that the terms were advanced by Borden on a take it or leave it basis. Thus, there is no evidence in this record to conclude that the contract in question was one of adhesion. DeMusz was free to either accept the relationship or reject it. Consequently, we fail to see the relevance of the David and Goliath allegory the dissent advances.
*58 DeMusz never maintained, as the dissent suggests he should have, that he anticipated the ninety-day termination clause would not be exercised by Borden until he had sufficient time to pay off his loans. If that were DeMusz's expectation we would have expected plaintiff's damage claim to be premised on the amount of the outstanding loans. But it was not. Instead, plaintiff sought damages for lost profits beyond the ninety-day termination period ending in August 1987, as if Borden had no right to terminate at all. Taken to its logical conclusion, the dissent would hold that the ninety-day termination provision written into the contract by DeMusz gave Borden an illusory right while plaintiff, on the other hand, had the absolute right to back out if it found a market for the clams that paid more than Borden was willing to pay.
Nor do we find anywhere in the record testimony that would allow a jury to conclude, as the dissent suggests it may have done, that the ninety-day termination provision was intended by DeMusz to require termination only for cause. That theory was not only not testified to, it was not argued or charged to the jury. Thus, we find it puzzling that the dissent justifies the verdict here on the possibility that the jury could find an implied "good cause" termination requirement in the agreement. In any event, there is no evidence to contradict Borden's testimony that it canceled the contract simply because it did not have a need for that quantity of clams at that price, and was upset over Dempsey's relationship with plaintiff.
The dissent also glosses over the distinction between the different corporate structures purposely used by DeMusz to operate the two vessels. Evidence concerning Borden's relationship with Sea Work was relevant only in analyzing whether Borden somehow breached the covenant of good faith and fair dealing in its contractual relationship with Sons of Thunder. It must be kept in mind that Sons of Thunder was the plaintiff here, not Sea Work, or for that matter, Sea Labor, another one of DeMusz's corporations. Most importantly, DeMusz was not the plaintiff, and at the time this suit was instituted and when the matter was tried DeMusz no *59 longer had an interest in plaintiff or Sons of Thunder. In our view the only relevant evidence on the subject of the interplay between Sons of Thunder and Sea Work was DeMusz's decision to use the credit of Sons of Thunder to borrow money in order to finance the changes required to reconvert the Jessica Lori back to a stern dredge vessel. It is true that Borden knew of that effort. However, at the same time, Borden had already given DeMusz notice that it did not intend to adhere to its contract with Sons of Thunder. Furthermore, the loan funds were not advanced to DeMusz until the fall of 1986, long after the contract with Borden was in breach. Yet DeMusz elected to close the loan and accept the proceeds. In light of DeMusz's knowledge that Borden intended not to live up to its agreement with Sons of Thunder, and his knowledge that Borden had the right to terminate on ninety-days notice, it simply cannot be said that DeMusz had a reasonable expectation that Borden would refrain from terminating the contract until such time as Sons of Thunder could pay off the loan it incurred on behalf of Sea Work.[3] In this respect, this case differs significantly from Bak-A-Lum, supra, in which the plaintiff there made a substantial financial commitment to the ongoing business relationship at a time when the defendant knew both of the financial commitment and the fact that it intended to terminate its contract with the plaintiff.
The dissent also focuses on Borden's insistence that DeMusz agree personally to repay a $125,000 business loan with interest that Borden had previously advanced to Sea Work, without interest and without personal liability, as evidence of Borden's lack of good faith. However, the record clearly reflects that DeMusz did *60 not sign the personal promise to repay until July, 1987 ÔÇö long after Borden had given notice that its contract with Sons of Thunder was going to be terminated. Furthermore, he signed the agreement to repay after he severed his relationship with Sons of Thunder, but maintained his sole ownership interest in Sea Work. If anything, that action shows DeMusz's desire to salvage his relationship with Borden in his capacity as a principal of Sea Work. We fail to see how that event has any bearing whatsoever on the Sons of Thunder contract which, according to the jury's own finding, had been properly terminated with the May 8th notice.
The dissent also suggests that Gallant and Nicholson formed a sinister plot to destroy DeMusz's relationship with Borden. However, the trial court ruled that Nicholson's machinations were not relevant to the issue concerning Borden's contract obligations to Sons of Thunder, and the jury was so instructed. Although plaintiff cross-appealed from that determination, it withdrew the cross-appeal as a part of a stipulation which settled part of the case, and limited the issues to be presented on appeal. We are at a loss to understand how the dissent justifies, in part, the jury verdict on evidence specifically excluded from the trial and not challenged on appeal by plaintiff.
Likewise unfathomable is the dissent's recitation of the ways in which Borden allegedly breached its equipment lease agreement with Sea Work, a separate corporate entity from plaintiff and not a party to this action. We repeat: Sea Work is not a plaintiff, and we fail to see how a breach of an agreement with Sea Work has any bearing on the implied covenant of good faith and fair dealing in the Sons of Thunder contract upon which this suit was based.
Accordingly, we reverse the portion of the judgment that awarded plaintiff damages against Borden in the sum of $412,000 based on Borden's alleged breach of an implied covenant of good faith and fair dealing, and enter judgment in favor of Borden with respect to such claim. Since we have entered judgment in favor of *61 Borden, we do not reach nor decide the damage issue raised by this appeal.
HUMPHREYS, J.A.D. (dissenting).
Donald DeMusz was a fisherman with a high school equivalency diploma. He was employed by Borden as the captain of one of Borden's clamming vessels in the Chesapeake Bay. His work was so exemplary that Borden later engaged him to manage their four clamming vessels.
Borden and DeMusz agreed to embark on a long term joint business undertaking characterized by them as a "joint venture." The purpose of the joint venture was to enable Borden to remove the shells of clams at sea rather than at Borden's processing plant on land. The project was called "Shuck-at-Sea."
DeMusz was to purchase and rig the Shuck-at-Sea vessels. Borden would place its shell removal equipment on board the vessels and the shells would be removed there. Borden would buy from DeMusz a specified quantity of the clam meat at a set price. This would give DeMusz an income stream with which to repay the large amounts of money he would have to borrow to purchase and rig the vessels.
Acting without legal assistance, DeMusz prepared a one page, four sentence contract. The contract required Borden to buy a specified amount of clams at market price thereby insuring DeMusz an income stream. A Borden Vice President approved the contract and it was signed by Borden and the plaintiff.
The project took more time than anticipated but was ultimately successful. The delay was not due to DeMusz. He borrowed money and acquired and rigged the vessels. Borden enabled DeMusz to obtain well over a million dollars in loans by assuring the bank that Borden had a "very solid" and "ongoing" business relationship with DeMusz. DeMusz fulfilled all his contractual obligations. The vessels had record catches and their operations met all of Borden's requirements.
*62 Borden later changed management. Borden's new management disliked the DeMusz contract. Borden first refused to honor the contract, then breached the contract and finally unilaterally terminated the contract and the joint venture.
After a six week trial, the jury found that Borden (1) breached the express terms of the contract and (2) in terminating the contract breached the covenant of good faith performance and fair dealing implicit in all contracts. The jury awarded plaintiff damages for both breaches. Borden appeals the damage award for the breach of the covenant of good faith and fair dealing.
The evidence overwhelmingly supports the jury's verdict. Borden intentionally breached the express terms of the contract without any legal or moral justification. Borden refused and failed to buy the amount of clams specified in the contract or to pay the contract price for the clams it bought. Borden charged DeMusz for expenses which were clearly Borden's obligation. Borden pressured and finally, through extortionate threats, forced DeMusz to sign personally a promissory note to Borden for $125,000 at an exorbitant interest rate of 6% above prime. The note was for advances made by Borden to a DeMusz corporation. Borden and DeMusz had previously agreed that the advance would not be DeMusz's obligation and would not bear interest.
Finally, Borden hired Robert Nicholson as manager of its Cape May plant. Nicholson's nickname was "ten percent Bob" because of his well known reputation for extorting kickbacks from fishermen such as DeMusz. The contract with Borden protected DeMusz from "ten percent Bob." However, as soon as Borden terminated the contract, Nicholson lived up to his reputation by extorting money from DeMusz for the privilege of fishing for Borden.
In terminating the contract at the time, under the circumstances and in the manner in which it did, Borden clearly breached its implied covenant of good faith performance and fair dealing. In so acting, Borden took grossly unfair advantage of DeMusz, its much weaker contractual partner in a long term joint undertaking. *63 Borden also abused its contractual right to terminate the contract and destroyed DeMusz's reasonable expectations under the contract.
The effect of the breach on DeMusz was catastrophic. DeMusz lost his fishing vessels and his business. He was left with a mountain of debt. He and his wife lost their homes at a sheriff's sale.
The majority says that Borden's "commercial practices" should not be "applauded." Nevertheless, the majority reverses the jury verdict justly compensating the victim of Borden's "commercial practices."
The majority reaches this unjust result by concluding that the covenant of good faith performance and fair dealing must be "overridden" because Borden had an "absolute" right to terminate the contract. This conclusion is out of step with the New Jersey Supreme Court opinion in Bak-A-Lum Corp. v. Alcoa Building Prod., 69 N.J. 123, 351 A.2d 349 (1976), and similar cases in New Jersey and throughout the country. The decision also represents a sharp break with well settled New Jersey jurisprudence that corporations and other business entities must conduct themselves in accordance with high standards of ethics and probity. Finally, the decision works a terrible injustice upon Donald DeMusz. He has been grievously wronged by his contractual business partner, but has been deprived of a just remedy. I dissent.

 TABLE OF CONTENTS
 I Appellate Fact Finding 64
 II The Issue Before Us 75
 III The Evidence Viewed Under The Dolson Standard 78
 IV The Broad Scope Of The Covenant Of Good Faith
 Performance And Fair Dealing 88
 V Damages 103
 VI Conclusion 104

*64 I

APPELLATE FACT FINDING
Borden's appeal is from the trial judge's denial of Borden's motion for a judgment notwithstanding the verdict ("n.o.v."). The evidence on such a motion and the inferences from the evidence must be construed in favor of the party opposing the motion, here the plaintiff. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969).
The majority, however, considers the evidence as if it, not the jury, were the trier of fact. Inferences from the evidence are drawn in favor of Borden. Factual conclusions are reached which depend on construing the evidence from Borden's standpoint and in a light unfavorable to DeMusz while ignoring evidence and inferences favorable to DeMusz. Factual findings unfavorable to DeMusz are made on matters which were not in issue at the trial. The four sentence contract is expanded to include language and meaning which are plainly absent. The following examples illustrate this appellate exercise of the jury's function.
The majority states that the "contract granted both plaintiff and Borden the power to unilaterally terminate the contract without cause." See majority opinion at 53, 666 A.2d at 562 (emphasis added). Contrary to the majority's statement, the contract is silent with respect to whether the contract could be terminated "without cause." Courts in considering the interplay between a termination clause and the implied covenant of good faith performance and fair dealing have consistently distinguished between (1) a contract which provides specifically that it may be terminated without cause or without reasons or for any cause or any reason and (2) a contract such as this one which authorizes a party to terminate but does not mention cause or reasons. See infra at 98-103, 666 A.2d at 585-587. The majority in its analysis of the legal authorities ignores this distinction.
The majority also undertakes to construe this contract. The majority concludes that the contract cannot be construed "to *65 protect any expectation on the part of plaintiff, that the contract would not be terminated before the full five year term expired or before plaintiff had paid off its loan on the Sons of Thunder and its guarantees on the Sea Work loans on the Jessica Lori." See majority opinion at 53, 58-60, 666 A.2d at 562, 565-566.
Ordinarily, the construction of an integrated contract is for the court. See Michaels v. Brookchester, Inc., 26 N.J. 379, 387, 140 A.2d 199 (1958); Newark Publishers' Ass'n v. Newark Typographical Union, 22 N.J. 419, 427, 126 A.2d 348 (1956); Jennings v. Pinto, 5 N.J. 562, 570, 76 A.2d 669 (1950). However, this one page four sentence contract can hardly be considered as integrated, i.e., "`the final and complete expression of the agreement.'" See United States v. Clementon Sewerage Auth., 365 F.2d 609, 613 (3rd Cir.1966). See also 2 Restatement (Second) Contracts  228 (1981). In addition, whether a contract is integrated is found "`in the conduct and language of the parties and the surrounding circumstances. The document alone will not suffice'...." See Atlantic Northern Airlines, Inc., v. Schwimmer, 12 N.J. 293, 304, 96 A.2d 652 (1953); see also 2 Restatement (Second) of Contracts  209 (1981). Here, the conduct of the parties and surrounding circumstances were in sharp dispute. Thus, whether this was an "integrated" contract was for the jury.
Further, the principle that the court ordinarily construes an integrated contract is "predicated upon the absence of an issue of fact." Jennings v. Pinto, supra, 5 N.J. at 570, 76 A.2d 669. If the meaning of the contract or the intention of the parties is ambiguous or dependent on issues of fact, then the construction of the contract is for the jury. Ibid. In addition, the conduct of the parties in the performance of the agreement "may serve to reveal their original understanding." See Michaels v. Brookchester, Inc., supra, 26 N.J. at 388, 140 A.2d 199. Under such circumstances, the judge must "submit the issue of the meaning of the contract to the jury as one of fact." Ibid.
*66 The trial judge and the parties recognized and applied these fundamental legal principles. The judge charged the jury fully and correctly on the applicable principles of contract law. The judge advised the jury that in making their determination of the terms of the contract, the jury must consider:
not only the language the parties chose to put down on paper, but also their course of dealing prior to the execution of the contract and during the course of their performance under the contract and the commercial context out of which their agreement arose, because these matters may help explain and supplement the written contract.
The judge charged further:
In determining what the provisions of the agreement were, your goal is to determine what these two parties intended to accomplish by choosing the language which they did by reading the language of their contract in its entirety. In making this determination, you must consider the relations between these two parties, the attendant circumstances and the objects they were attempting to accomplish. All the terms of the contract should be interpreted in the light of the commercial context and circumstances under which it was entered into. The entire agreement must be accorded a rational meaning which squares with the express general purposes of the parties. Even if you find their intention to be doubtful or obscure, you must adopt the most fair and reasonable construction of the language which gives neither party an unfair or unreasonable advantage over the other and which results in the least hardship to either of the parties. All of the terms of the contract must be read together and harmonized, and you must avoid focusing on an isolated phrase or interpreting the contractual language in such a way as one term conflicts with another term. In short, you must give a common sense meaning to the whole agreement which effectuates the intent and purposes of the parties to this contract.
The judge specifically charged the jury that "a key point in dispute is this termination provision of the contract, how long the parties intended and agreed that their contractual relationship would last, and when and under what circumstances Borden was entitled to terminate the agreement." (Emphasis added).
In addition, the judge charged the jury that the parties to a contract are always competent to perform a contract differently from the manner contemplated by its express terms and that the manner in which the parties perform their contract is referred to as their course of performance. The judge advised the jury that if you find the parties in the course of performance altered the express contract terms or even constructed new contract terms, *67 the plaintiff is entitled to recover damages "if you find liability, that it would have suffered had performance been rendered not pursuant to the contract terms, but pursuant to the party's course of performance under the contract."
Borden argued that the contract had been modified in the course of performance, namely that the plaintiff had waived its rights under the contract. The judge therefore charged the jury that it could consider whether the contract had been modified or changed by the parties in the course of their dealing and whether there had been a waiver of any rights.
The judge also properly charged the jury on the implied covenant of good faith and fair dealing. The court said that the "purpose" of the covenant is to "protect each party's reasonable expectations that the objects and purposes they sought to achieve by means of their agreement will be achieved." The court complied with Karl's Sales and Serv. v. Gimbel Bros., 249 N.J. Super. 487, 592 A.2d 647 (App.Div.), certif. denied, 127 N.J. 548, 606 A.2d 362 (1991), by charging the jury that the motives of Borden in terminating the contract were irrelevant.
The judge concluded: "You have heard each attorney's arguments regarding this issue, and you will have to decide whether the plaintiff has established a breach of this implied term of the contract ... based on the evidence that's come before you in this case."
The judge's decision to leave the interpretation of the contract to the jury was eminently correct. The interpretation of this contract, including the interpretation of the implied contractual term of good faith performance and fair dealing and its interaction with the termination clause, clearly depend on disputed facts and the inferences to be drawn from those facts. The questions are therefore for the jury. See Michaels v. Brookchester, Inc., supra, 26 N.J. at 388, 140 A.2d 199; Newark Publishers' Ass'n, supra, 22 N.J. at 419, 126 A.2d 348; Jennings v. Pinto, supra, 5 N.J. at 570, 76 A.2d 669. The jury's reasonable determination of these questions should not be reversed because an appellate court "finds" the *68 facts differently and fashions from "its" findings, the appellate court's own interpretation of the agreement.
The following are other examples of appellate fact finding violative of the Dolson v. Anastasia standard. The majority finds that "It was DeMusz, not Borden, who chose to give `either' party the right to terminate the contract on ninety days notice." (Emphasis added). Majority opinion at 57, 666 A.2d at 564. The majority does not indicate how it reached this finding of fact. The finding is contrary not only to the testimony of DeMusz but also to the testimony of Borden officials, Southwell and Booker. The testimony of these witnesses was that it was Borden who required the cancellation clause. This was also the position of Borden's counsel as shown by his questioning of witnesses and by his summation.
Furthermore, the majority offers no reason why DeMusz would "choose" to have a cancellation clause included in the contract. The clause would benefit Borden, not DeMusz, as Booker presciently observed in a memo to Southwell. See infra at 80, 666 A.2d at 576. Moreover, DeMusz had no real choice regarding the inclusion of a termination clause. He had to acquiesce in Borden's requirement of a cancellation clause or else abandon the project.
Abandonment was not a realistic alternative for DeMusz. He had already invested $750,000 in buying and rigging the Jessica Lori in accordance with Borden's requirements. Thus, he had to "go along" with Borden's requirement of a termination clause and trust Borden to act in a fair and honorable fashion, i.e. trust that Borden would comply with its implied covenant of good faith performance and fair dealing.
Furthermore, the picture painted by the majority of DeMusz as a "knowledgeable" business man dealing at arms length with Borden bears no resemblance to reality. See infra at 70, 666 A.2d at 571. This contract may not have been the traditional printed form contract of adhesion, see Rudbart v. North Jersey District Water Supply Comm'n, 127 N.J. 344, 354, 605 A.2d 681, cert. *69 denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992); however, the vastly unequal bargaining power and position of the parties was real and apparent. The jury was entitled to consider that unequal status and bargaining power in determining the meaning and effect of the contract and all its terms, including the implied term of good faith performance and fair dealing. See Vasquez v. Glassboro Service Ass'n, Inc., 83 N.J. 86, 101-102, 415 A.2d 1156 (1980); Shell Oil Co. v. Marinello, 63 N.J. 402, 408, 307 A.2d 598 (1973), cert. denied, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974) and authorities cited infra at 88-103, 666 A.2d at 580-587.
The majority also finds that there is "no proof on this record that Borden's termination of the contract was done in bad faith, that is, with a lack of `honesty in fact.'" See majority opinion at 53, 666 A.2d at 563. The majority finds that "a reasonable jury could not reasonably find that Borden was `dishonest in fact' in dealing with plaintiff." See majority opinion at 57, 666 A.2d at 564. To the contrary of these findings, the record is replete with evidence of Borden's bad faith and gross misconduct culminating in the termination of the contract. See infra at 78, 84-88, 666 A.2d at 575, 578-580.
The majority also states that DeMusz "never maintained" that the ninety day termination clause "would not be exercised by Borden until he had sufficient time to pay off his loans." See majority opinion at 58, 666 A.2d at 565. This statement is misleading. DeMusz maintained at trial that the contract precluded Borden from exercising the termination clause after the first year of the contract. Under DeMusz's contention, the contract after the first year had elapsed would continue for the full five year contract term thus enabling DeMusz to pay off his loans. The raison d'etre of the contract was to provide DeMusz with income over the five year period of the contract so that he could repay the five year bank loans he had to obtain to comply with Borden's requirements for its Shuck-at-Sea project.
*70 Moreover, both DeMusz and Booker testified that the minimum number of clams that Borden had to buy under the terms of the contract was set, with the assistance of Borden's accountant, at a number which would support DeMusz's "investment in the project" including not only his operating costs but also his financing regarding the vessel. The jury could readily find from the foregoing that DeMusz had a reasonable expectation that Borden would comply with its covenant of good faith performance and fair dealing by not canceling the contract until he had an opportunity to pay off his loans.
The majority finds that "the record reveals that DeMusz was quite knowledgeable in business matters." See majority opinion at 57, 666 A.2d at 564. To the contrary, the record reveals that DeMusz, a captain of a fishing vessel with only a year and a half of high school, was so unknowledgeable and trusting in business matters that he relied on Borden's accountant to calculate his costs for the venture and what income he would need from Borden under the contract to recover his investment.
The majority states that it does not "find anywhere in the record testimony that would lead a jury to conclude, as the dissent suggests it may have done, that the ninety-day termination provision was intended by DeMusz to require termination only for cause." See majority opinion at 58, 666 A.2d at 565. The majority's statement is sharply at variance with the record. DeMusz and Booker negotiated the contract. Booker testified that under the contract the right to cancel could only be exercised by Borden after the first year if there was good cause to do so. He described that good cause as a "very serious business reason," e.g. the shutdown of Borden's Cape May plant "maybe a condemnation of the fishing zone or the clam beds, perhaps a sale of the business ... an unforeseen large event in the history of the corporation."
To support his view that a "serious business reason" was required, Booker pointed out in his testimony that both of Borden's other contracts with DeMusz corporations, specifically authorized cancellation without cause, while the Son's of Thunder *71 contract was silent with respect to cause. DeMusz's testimony was essentially the same as Booker's.
DeMusz's attorney, argued in summation his client and Booker's position on cause. Borden's attorney argued in summation that the contract language meant that Borden had the right to cancel "for its own business reasons."
The judge said in his charge to the jury that "a key point in dispute" is "when and under what circumstances Borden was entitled to terminate the agreement." (Emphasis added). The judge told the jury that it was up to them to determine what the parties had intended. The above shows that the majority has usurped the jury's function by deciding, without the benefit of hearing the evidence, that the parties intended that Borden had an "absolute right" to terminate "without cause."
The majority attempts to excuse Borden's misconduct by asserting that Borden's acts were, in some cases, taken against DeMusz's Sea Work Corporation or against DeMusz personally, neither of whom were parties to the action. This argument completely overlooks the realities of the situation. Borden dealt exclusively with DeMusz. Both Borden and DeMusz in their dealings with each other, treated plaintiff and Sea Work as the alter ego of DeMusz. Clearly, the real parties in interest were Borden and DeMusz. See R. 4:26-1. The trial judge agreed. He ruled that the various business corporations and their relationship with each other were "inextricably intertwined," and that evidence regarding those relationships and transactions were relevant and admissible.
Borden initially appealed this ruling. Borden contended in its appeal that the Sea Work contract was "unrelated" to plaintiff's contract and that the Sea Work Corporation was "unrelated" to plaintiff. Later Borden expressly abandoned this part of its appeal leaving the trial judge's ruling unchallenged.
An appellate court should not resurrect an issue abandoned by the appellant and then decide the issue in favor of the appellant in *72 order to shore up the court's decision. Furthermore, the ruling of the trial judge is correct. The wrongful acts of Borden committed against Sea Work and DeMusz were an integral part of the dealings between Borden and plaintiff. A finding that these wrongful acts have no bearing on Borden's compliance with its covenant of good faith performance and fair dealing reflects a myopic and distorted view of the facts. The jury is not required to examine the evidence through filtered lenses. The jury as the trier of fact is entitled to pierce through form and find the facts as they truly are. See State, Dept. of Envtl. Protect. v. Ventron Corp., 94 N.J. 473, 500, 468 A.2d 150 (1983) (corporate veil may be pierced to prevent injustice).
The majority also finds as a fact that "[p]laintiff plainly violated its implied obligation of good faith and fair dealing owed to Borden by entering into the contract with Borden to sell the quahog clams, knowing that one of its directors and principle [sic] stockholders [Dempsey] was also Borden's manager in charge of purchasing such clams." See majority opinion at 54, 666 A.2d at 563. However, the trial judge found that Borden was not injured in any way by Dempsey's involvement. The involvement was not a secret. Dempsey's interest was disclosed in the corporate documents publicly on file with the New Jersey Secretary of State. Moreover, the evidence was that Dempsey did not favor DeMusz in any improper way.
Further, whether plaintiff violated its obligation of good faith and fair dealing was not an issue in this case. The judge struck Borden's defense based on Dempsey's involvement. The judge charged the jury that Dempsey's interest in the plaintiff had "no bearing on this case" and could not be considered. Borden has withdrawn its appeal from the judge's ruling. We should not be making fact findings regarding an issue not before us, not submitted to the jury and having "no bearing" on the case.
The majority also finds that when "Borden learned of Dempsey's stock interest in plaintiff in violation of its policy against conflicts of interest, Borden had a right to terminate the contract." *73 See majority opinion at 54, 666 A.2d at 563. Whether Borden had such a right is a mixed question of law and fact which should be determined by the trier of fact, here a jury. The question was not submitted to the jury and therefore should not be considered by an appellate court. Moreover, even if Borden had such a right to terminate, the termination could and should have been in a reasonable and fair fashion, not accompanied by a refusal to honor a valid contract, a willful breach of that contract, extortionate threats and other misconduct all causing the financial ruin of the non terminating party. As stated by the court in B.E. deTreville, Jr. v. Outboard Marine Corp., 439 F.2d 1099, 1100 (4th Cir.1971):
Regardless of broad unilateral termination powers, the party who terminates a contract commits an actionable wrong if the manner of termination is contrary to equity and good conscience. ... That standard of conduct is far more stringent than one forbidding only actual fraud, and it may apply to an unconscionable reason for termination as well as to the causing of needless injury in the course of termination. (Emphasis added) (citations omitted).
The majority implies that Borden's misconduct may have been justified when Borden learned of Dempsey's interest in the plaintiff. See majority opinion at 54, 666 A.2d at 563. However, Borden had begun to violate the contract many months before learning of Dempsey's interest. Moreover, Borden's stated reasons at the time for terminating the contract were its own financial interests, not Dempsey's involvement with the plaintiff. Memoranda were prepared by Borden in April of 1987, on whether to abandon the Shuck-at-Sea project. Listed and discussed in these memoranda were the reasons for and against abandonment. The Dempsey involvement was not mentioned. Further, Borden did not assert Dempsey's involvement as a defense until some fifteen months after plaintiff instituted this suit. Clearly, any contention by Borden that its termination of the contract was due to Dempsey is a very late afterthought.
The majority makes another and critical finding of fact by concluding "Certainly, there was no reasonable basis for DeMusz to believe that Borden would either comply with the terms of its contract with plaintiff or continue it long enough for plaintiff to *74 pay off the $200,000 loan." See majority opinion at 56, 59, 666 A.2d at 564, 565. The majority bases this "certain" finding of fact on Gallant's oral statement to DeMusz in May of 1986 that Borden would not honor the contract with plaintiff.
The majority in making this finding of fact ignores the following evidence. Around the time of the Gallant statement, DeMusz was seeking to obtain an additional loan so that he could comply with Borden's requirement for the re-rigging of the Jessica Lori. DeMusz prepared a written proposal for the bank in which he said:
Sea Labor, Inc. proposes to obtain a commercial loan from First Jersey National Bank/South for the sum of $325,000.00 in agreement [sic] with Sea Work, Corp. and Snow Food's Management for the combined effort to upgrade the fishing vessel "Jessica Lori", owned by Sea Work, Corp., which is under contract to Snow Food Products [Borden] in a joint venture known as Shuck-at-Sea or the S.A.S. project. (Emphasis added).
The proposal also contained a document entitled "Source of Revenue Yearly" which indicated that plaintiff would be earning income based on a "minimum of 7,680 bu[shels] per week, per [the Borden] contract." A copy of a portion of the contract was also attached to the proposal to the bank.
DeMusz asked Gallant to sign the proposal to the bank. Gallant sent the proposal to Borden Vice President Southwell. In the memo, Gallant referred to the contract with plaintiff and enclosed it. Southwell returned the memo with an "O.K." and his initials dated May 15, 1986. On that same day, Gallant signed the proposals to the bank stating "I, William Gallant, have read the proposels [sic] included here-in and as operations manager of Snow Food Products [Borden] understand and acknowledge same."
Thus, Gallant was telling DeMusz's bank ÔÇö and inferentially telling DeMusz ÔÇö that Borden had a contract with plaintiff and that plaintiff would earn money from that contract based on Borden's purchase of a minimum 7,680 bushels as set forth in the contract. The jury was certainly entitled to conclude, based on these facts, that DeMusz in proceeding with the loan reasonably relied on Borden meeting its contractual obligations to him in order to *75 permit him to repay this additional debt. This conclusion is buttressed by a letter Gallant wrote to DeMusz's bank the month before in connection with DeMusz's charter contract with Borden. Gallant said in the letter that Borden had "enjoyed" for several years a contractual relationship with DeMusz's firm, Sea Labor, Inc., that the charter contract was "automatically" renewed annually, that DeMusz's performance was satisfactory and that barring any unusual happenings, Borden "expects to continue said agreement [the charter contract] indefinitely."
Contrary to the majority's "certain" finding, the jury under the Dolson v. Anastasia standard was entitled to conclude that notwithstanding Gallant's oral statement, DeMusz reasonably relied on Borden honoring its contractual obligations to him. Borden was among the largest United States Corporations. Borden, as testified to by Booker, was the nation's largest clam processor on the East Coast. DeMusz could reasonably expect that a company of this size and scope, his former employer and long time contractual partner, would keep its word. Besides, DeMusz did not have a real choice regarding the additional financing. He was already heavily in debt to meet Borden's requirements for the Shuck-at-Sea project. The additional loan was necessary to complete the project. To back out now from the Shuck-at-Sea project because of Gallant's oral statement, would inevitably result in DeMusz's ruin. In any event, the jury could easily find from a review of all the evidence that DeMusz had a reasonable expectation that Borden would act in compliance with its express and implied contractual obligations.
In sum, the decision in this case should be based on the jury's fact finding, not fact finding by the appeals court in a manner violative of the Dolson v. Anastasia standard.

II

THE ISSUE BEFORE US
The issue before us was squarely presented to the jury by counsel. Borden's counsel argued in summation that Borden did *76 not violate the covenant of good faith and fair dealing and that Borden terminated the contract for business reasons. Plaintiff's counsel argued in summation that after its management change, Borden breached its covenant of good faith and fair dealing by ruthlessly engaging in a repeated pattern of "constant utter disregard for the terms of both contracts, a pattern of bad faith dealing, a pattern of really driving Mr. DeMusz to the wall financially and eventually ruining him and his companies." Plaintiff's counsel in his summation detailed at length the copious evidence supporting this argument.
The jury agreed with plaintiff's counsel. The jury specifically found in answer to an interrogatory that Borden breached its obligation of good faith and fair dealing in terminating the contract. Borden has not challenged this factual finding by the jury. Borden does not contend that the jury's verdict is against the weight of the evidence, nor has Borden moved for a new trial. Nor did the trial judge in his denial of Borden's motion for a judgment n.o.v. take issue with the jury's finding. Nor should we.
We must not lose sight of the simple issue before us. Did the trial judge err in denying Borden's motion for a judgment n.o.v.? In deciding that issue we are not privileged to make our own fact findings as the majority has done. We must instead apply the well settled standard clearly set forth in Dolson v. Anastasia, supra, 55 N.J. at 5-6, 258 A.2d 706:
whether `the evidence, together with the legitimate inferences therefrom, could sustain a judgment in favor' of the party opposing the motion, i.e., if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied.... The point is that the judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion.
The Dolson standard "is relatively mechanical and does not involve the weighing of evidence." See Johnson v. Salem Corp., 97 N.J. 78, 92, 477 A.2d 1246 (1984); Sun Source, Inc. v. Kuczkir, 260 N.J. Super. 256, 267, 615 A.2d 1280 (App.Div. 1992), certif. *77 denied, 133 N.J. 439, 627 A.2d 1144 (1993); Malin v. Union Carbide Corp., 219 N.J. Super. 428, 435, 530 A.2d 794 (App.Div. 1987). In this case, the majority in page after page of its opinion weighs the evidence in order to construct findings of fact to fit its decision.
Even if the proofs are undisputed, that may not be sufficient in itself to warrant the granting of a judgment n.o.v. The fact finder is free to reject uncontested proofs on credibility grounds. See Johnson v. Salem Corp., supra, 97 N.J. at 92, 477 A.2d 1246. Credibility was very much in issue in this case; hence the majority should not, as it repeatedly does, rely on allegedly uncontroverted evidence.
In addition, if "there are numerous theories upon which the jury could have rested its determination," the verdict of the jury must be upheld if there is "any one possible theory of liability ... substantiated by the evidence taken as a whole...." See Lamendola v. Mizell, 115 N.J. Super. 514, 527, 280 A.2d 241 (Law Div. 1971). Here, the jury could have rested its express finding of a breach of the covenant of good faith performance and fair dealing on any one or more of numerous grounds. For example, the jury could have found that the breach of the implied covenant resulted from Borden's terminating the contract after breaching it and after having committed many acts of misconduct severely harming plaintiff and DeMusz. The jury could have concluded that the breach occurred because Borden took unfair advantage of its much weaker contractual partner and abused its power to terminate by exercising it at a time, or in a manner or under circumstances which were grossly unfair to DeMusz and would ineluctably result in his total financial destruction.
The standard to be used by an appellate court in reviewing a trial court's decision on a motion for a judgment n.o.v. is the same as for the trial court. See Fischer v. Canario, 277 N.J. Super. 302, 307, 649 A.2d 875 (App.Div. 1994), certif. granted, 142 N.J. 449, 663 A.2d 1357 (1995); Goss v. American Cyanamid, 278 N.J. Super. 227, 238, 650 A.2d 1001 (App.Div. 1994). See also 5A James W. *78 Moore & Jo Desha Lucas, Moore's Federal Practice Â 50.07 (3d ed. 1990), regarding the similar federal rule. However, an appellate court must also give deference to the far greater ability of the trial judge to assess and evaluate the evidence and the credibility of the witnesses. See Dolson, supra, 55 N.J. at 7, 258 A.2d 706. Moreover, the trial judge's "`feel of the case'" is very important. See Carrino v. Novotny, 78 N.J. 355, 361, 396 A.2d 561 (1979). The trial judge here was well equipped to deal with the complex questions in this case. The judge had managed the litigation for several years. He presided over the six week trial.
In denying Borden's motion for a judgment n.o.v., the trial judge concluded that the jury had properly focused on Borden's whole course of conduct, including the manner in which Borden refused and failed to carry out its contractual obligations. The judge referred to Borden's improper charges and assessments against DeMusz and his companies engaged in Borden's Shuck-at-Sea project, the high interest rate on the $125,000 loan repayment coerced by Borden from DeMusz and other misconduct by Borden, all of which culminating in Borden's termination of the contract. The judge found that the evidence supported the jury's finding that Borden had breached the implied covenant of good faith performance and fair dealing. The jury, the judge said, is entitled to "look at the whole ball of wax, the context, ... the course of conduct between them, culminating in termination ..." and from all that reach a determination as to whether Borden breached the implied covenant of good faith performance and fair dealing. The following review of the evidence in accordance with the Dolson criteria demonstrates that the trial judge was clearly correct.

III

THE EVIDENCE VIEWED UNDER THE DOLSON STANDARD
The pertinent evidence and reasonable inferences from the evidence "viewed most favorably" to plaintiff, as required by *79 Dolson, can be succinctly summarized as follows. Donald DeMusz left high school at sixteen because his family was having a "hard time." He had fifteen brothers and sisters. He joined the Air Force and obtained a high school diploma through the Air Force. He was an aircraft mechanic and flight engineer. His rank was Technical Sergeant. He received an honorable discharge from the Air Force.
In 1978, he was hired by Borden. He became Captain of the Arlene Snow, one of Borden's four clamming vessels. His work was outstanding. According to Booker, Borden's Group Operation Manager, DeMusz was a very fair man and achieved results. Every experience Booker had with DeMusz was "very positive." "Everything" DeMusz did was done in Borden's interest as well as his own. DeMusz had record numbers of trips and record numbers of catches. He was excellent, knew the business very well and was "one of the best."
In 1983, Borden entered into a charter agreement with a DeMusz corporation, Sea Labor, Inc. Borden saved approximately $60,000 per year by reason of this agreement. With DeMusz in charge, production went up significantly.
Around this time, Booker engaged in discussions with DeMusz regarding a long standing Borden project to shuck clams at sea immediately after harvesting. This project would have many advantages for Borden. A larger haul of clam meat could be obtained per boat trip because weighty clam shells would be discarded at sea. Boats could therefore stay out at sea longer and collect more clam meat on the Shuck-at-Sea boats. The clam meat could be processed, chilled and ready for transport to the plant in Maine almost immediately upon docking in Cape May. Borden would also avoid the environmental costs and problems associated with the disposal of clam shells on land and would save water treatment expenses at its Cape May processing plant. The annual cost savings to Borden would be, Booker testified, at least $1 million dollars per year. Borden would earn 34 percent a year on its investment.
*80 Borden had developed by late 1983 some Shuck-at-Sea processing equipment and was prepared to install the equipment on a boat for testing. Borden attempted to install the equipment on the Arlene Snow but the boat was too small. Borden did not wish to buy a larger boat. Borden's budget for the Shuck-at-Sea project did not allow for such a large expenditure.
Booker and DeMusz discussed the problem. DeMusz offered to buy a large boat on which Borden could install the Shuck-at-Sea equipment. He made this offer in order to help Borden with its Shuck-at-Sea project. Borden in exchange would purchase the clams which DeMusz harvested and processed with the boat.
Booker in a March 1984, memo to Vice President Southwell of Borden outlined the advantages to Borden of undertaking this project jointly with DeMusz. Booker noted in his memo the power and control Borden would have over DeMusz. Booker wrote: "Although we lose some measure of control by using a non-Borden hull, we still have a significant mutual interest with DeMuse (sic). His principal business will still be in chartering the [Borden] fleet and in captaining the Arlene. He needs a dependable customer for the clams that he catches, either shell stock or meat. If we terminate our agreement with him, he would have a hard time making the payments on his boat." (Emphasis added).
Southwell approved. Booker sent DeMusz a "letter of intent" in December of 1984 which read as follows:
Dear Don:
This will serve as a "Letter of Intent" from Snow Food Products concerning our plan to work with you toward developing a contract to purchase clams from your new vessel. We have already had numerous discussions on this project and you are in the process of drafting a contract.
It is our intention, assuming that we can reach agreement between both parties, that we will have a contract and be doing business as soon as your new vessel has been refitted for shell-stocking quohog (sic) clams.
We have enjoyed cordial business relations in the past and expect that this will continue in the years to come.
DeMusz purchased a large boat which he named the Jessica Lori. The cost of purchasing and rigging the Jessica Lori was *81 $750,000 which DeMusz financed by a bank loan. Booker expected DeMusz to show the Borden letter of intent to a bank in order to get financing.
In July 1984, Borden and Sea Work entered into a written agreement entitled "Equipment Lease." Under the agreement, Borden would place shucking equipment on the Jessica Lori. Sea Work would then sell to Borden at a set price the clam meat that was harvested and processed at sea through the use of Borden's equipment.
The parties anticipated that Borden's Shuck-at-Sea processing equipment would be installed, tested and in operation on the Jessica Lori by the end of 1984. Borden's equipment, however, did not function properly. DeMusz had objected to Borden's faulty design but was overruled by Borden. As a result of Borden's errors, extensive redesign had to be done and the work was not completed until the Spring of 1985. Jessica Lori, in the meantime, engaged in harvesting clams as an independent supplier selling clams to Borden for processing at Borden's Cape May plant.
In August of 1984, shortly after Borden and Sea Work had signed the equipment lease for the Jessica Lori, Booker and DeMusz began talking about DeMusz obtaining a second large boat for the Shuck-at-Sea project. Borden needed the second large boat to assure a reliable supply of clams during bad weather when smaller vessels would not go out to sea. The larger boat would also greatly benefit Borden if an anticipated federal allocation system went into effect.
Booker and DeMusz arrived at an oral understanding that DeMusz would purchase the second boat. Borden would enter into a long term contract with DeMusz to purchase at a set price a fixed amount of clams to be harvested weekly by that boat. DeMusz would have a guarantee that Borden would purchase the clams he harvested; and thus, DeMusz would have a reliable income stream to pay for the financing of the boat. Borden's accountant helped DeMusz estimate costs and the amount of *82 income which DeMusz would need from Borden to support the boat and recover his investment.
In late December of 1984, DeMusz personally drafted a one page four sentence contract and sent it to Booker. The contract provided that Borden would purchase a specific quantity of clams from plaintiff at market price for one year. At the end of the one year period, the contract would be automatically renewed for a period up to five years. The agreement also provided that "Either party may cancel this contract by giving prior notice of said cancellation in writing ninety (90) days prior to the effective cancellation date." The cancellation clause was required by Borden. It differed, however, from the termination clauses in the other two Borden ÔÇö DeMusz contracts in that it did not specify that termination could be "without cause."
DeMusz had never drafted a contract before. He did not seek the assistance of an attorney. Borden did not make that mistake. The contract was reviewed and initialed by Borden's legal department and also reviewed by Vice President Southwell. Booker obtained Southwell's permission to sign the contract and it was signed in January of 1985.
The contract was extremely favorable to Borden. Booker estimated that the Shuck-at-Sea project when completed would rid Borden of serious environmental problems in its operations. The major cost of the project, i.e., the purchasing and rigging of the large vessel would be borne by DeMusz. Borden would have the services of an excellent fisherman who had a long and exemplary relationship with Borden. The only obligation of Borden would be to purchase a specified quantity of clams at market price from DeMusz. Furthermore, as Booker recognized in his March 1984, memo to Southwell, Borden would have DeMusz firmly under its thumb because if Borden terminated the contract, DeMusz would have "a hard time" repaying his indebtedness. The contract thus gave Borden the best of all possible worlds. DeMusz, however, had to rely on the good faith and fair dealing of his contractual *83 partner. In short, DeMusz had to rely on the covenant of good faith and fair dealing implicit in every contract.
Booker and DeMusz testified at trial that the five year term of the contract would not begin until plaintiff had obtained a boat ready for operations at sea. To finance the purchase and rigging of the second boat, DeMusz obtained another loan in the amount of $515,000 from First Jersey Bank. Booker met twice with the bank's loan officer assuring the officer that Borden had a "very solid" and "ongoing" business relationship with DeMusz and that "the bank should feel comfortable" that Borden's contract with plaintiff "should provide the cash flow" for DeMusz to pay off his loan. Booker was also aware that the term of the bank loan was five years. This was the same term set forth in the one page contract between DeMusz and Borden.
DeMusz bought and rigged the second boat, the Sons of Thunder. In the Spring of 1986, DeMusz began harvesting clams with the boat pursuant to the contract.
Meanwhile, the Jessica Lori was having difficulty. This was due to the Borden equipment again proving defective. Borden spent approximately five months aboard the vessel attempting to correct the problem. This prevented DeMusz from using the Jessica Lori for clamming and therefore he could not meet his fixed costs for ownership and operation of the boat. Booker recognized that Borden had to aid DeMusz with "his ongoing overhead expenses while they were basically preventing him from fishing with that boat."
In the summer of 1985, DeMusz informed Borden that he was out of money and would have to file bankruptcy unless something was done quickly. DeMusz met with Booker and Southwell and they arranged for an advance of up to $125,000 from Borden to Sea Work to cover the Jessica Lori's overhead costs. Borden agreed that Sea Work could "repay" the advance by increasing the price of the clam meat purchased by Borden from the Jessica Lori. Borden also agreed that the $125,000 was not to bear interest and DeMusz was not to be personally liable.
*84 Unfortunately, Borden's equipment still did not function as planned and the Jessica Lori had to be refitted once more. DeMusz paid an additional $350,000 for the refitting, and for this had to seek additional financing. Borden was aware that the plaintiff was being used as a conduit to borrow money and channel the money to Sea Work in order to finance the Borden Shuck-at-Sea project on the Jessica Lori. DeMusz was required by the bank to guarantee personally all of the loans. Borden once more assisted DeMusz in obtaining the additional financing. DeMusz submitted a written proposal to the bank in which he referred to his relationship with Borden as a "joint venture known as the Shuck-at-Sea or the S.A.S. project." The proposal included an analysis of the revenue payable to plaintiff from Borden and a provision that Borden would deposit directly into an escrow account monies earned by the three DeMusz corporations "as per contracts" with them. Attached to the proposal to the bank was a portion of the one page contract between Borden and plaintiff dated January 15, 1985.
William Gallant was the new operation manager for the Snow Food division of Borden. After first obtaining Southwell's approval, Gallant in May of 1986, signed the DeMusz proposal to the bank as Borden's operation manager. Gallant stated in the proposal that he had read it and "understood and acknowledged the same." See also supra at 74, 666 A.2d at 573.
By November of 1986, the Jessica Lori had finally completed its re-rigging and had begun harvesting clam meat for Borden using Borden's Shuck-at-Sea processing equipment. The Sons of Thunder had been in operation since the Spring. Both vessels performed well and the Shuck-at-Sea project was a success.
Meanwhile, Borden was changing its corporate hierarchy. In October 1985, Booker left the company and Vice President Southwell was retiring. Booker was being replaced by Gallant. Robert Culver became Gallant's superior. Culver admitted at trial that he had never read the one page contract; yet he approved *85 Gallant's subsequent actions regarding DeMusz including the termination of the contract.
Bob Nicholson was Borden's new manager of its Cape May plant. Nicholson had general supervisory authority over fishermen such as DeMusz. Nicholson promptly began to extort money from the fishermen. He could not, however, harm DeMusz because DeMusz had a contract with Borden. DeMusz's immunity from extortion would not last long because DeMusz's relationship with Borden was being destroyed by the new Borden team of Gallant and Nicholson.
Borden began to breach the contract by not purchasing from plaintiff the requisite number of clams set forth in the contract. Gallant was aware of and an early participant in the Shuck-at-Sea project. He was also aware of DeMusz's participation in the project. In October 1985, Gallant had written "To Whom It May Concern" that DeMusz has been involved with Borden in the "evolution of a processing vessel" that he is an "excellent boat operator"; and that his assistance in the Shuck-at-Sea project had been "instrumental." Nevertheless, Gallant upon assuming Booker's position in May of 1986, professed to be unaware of the one page contract. In response to DeMusz's complaints about Borden's breaches, Gallant said Borden would not honor the contract. Nicholson told DeMusz the same thing.
In addition, Borden, at Nicholson and Gallant's instigation, began buying less and less clams from the Jessica Lori. Borden also started charging enormous rental fees for the Jessica Lori shell shucking equipment even though Borden's equipment lease with DeMusz had no provision for a rental fee. Borden also started charging for the salt which was used in the processing operation on the Jessica Lori even though the equipment lease specifically provided that Borden was to pay for the salt. Also, Borden required DeMusz to pay for the CO2 used in the processing on the Jessica Lori although CO2 had not been contemplated in the original arrangements and the equipment lease was silent on the subject.
*86 Borden also refused to pay plaintiff the agreed price for the clam meat, thereby denying DeMusz the ability to repay the $125,000 advance. At the same time, Gallant insisted that DeMusz personally pay the $125,000 advance notwithstanding DeMusz's prior agreement with Borden that he would not be personally liable.
Borden's mistreatment of DeMusz worsened in 1987. Sons of Thunder was only used by Borden in the foulest of weather. Nicholson brought in new boats to fish for Borden upon their owners paying kickbacks to Nicholson.
Finally Borden in May of 1987, terminated plaintiff's contract and also the equipment lease. In so terminating, Borden admittedly breached the contract. The contract provided for ninety days notice prior to termination. Borden's termination letter gave plaintiff the ninety days. However, Borden removed the cages from the vessels ten days after the notice, thereby breaching the contract by shutting down DeMusz's operations in ten days rather than ninety.
The termination of the contracts left DeMusz in a hopeless position. He had two large vessels and no steady source of income to pay for their financing. Unprotected by contracts with Borden, he was at Nicholson and Gallant's mercy. DeMusz was shown no mercy. Nicholson would not send DeMusz's boats out to fish for Borden. Thus, DeMusz was effectively out of business.
Meanwhile, Gallant continued to pressure him to sign a promissory note for $125,000. Gallant told him that if he wanted to keep fishing for Borden, he had to sign the note. Finally DeMusz gave up and in July of 1987, he signed the note. After he signed the note, Gallant told Nicholson to give DeMusz priority over the other boats. Nicholson would not act, however, until DeMusz agreed to pay him kickbacks. The day after DeMusz agreed to pay the kickbacks, Gallant called and congratulated DeMusz on how well he was getting along with Nicholson.
*87 The majority argues that evidence of Nicholson's misconduct cannot under the trial judge's ruling be used to support the jury's verdict. See majority opinion at 60, 666 A.2d at 566. This argument misconceives the limited scope of the trial judge's ruling. Considerable evidence was admitted at the trial concerning Nicholson's misconduct. The trial judge told the jury that Nicholson's taking of kickbacks was outside the scope of his authority from Borden and therefore may not be considered with respect to Borden's performance of the contract. The trial judge, however, permitted plaintiff's counsel to argue to the jury that Nicholson "orchestrated" Dempsey's firing because Dempsey was interfering with Nicholson's shakedown of the fishermen. In addition, plaintiff's counsel argued in summation that Nicholson wanted to terminate Borden's agreements with DeMusz so that Nicholson could bring in independent vessels and require them to pay him kickbacks. The jury was therefore entitled to consider Nicholson's acts within these contexts.
Whether Gallant was involved with Nicholson's schemes may not have been clearly established, although DeMusz testified that he initially thought Gallant was involved in Nicholson's schemes; later DeMusz "guessed" that Gallant was not involved. In any event, it is clear that Nicholson and Gallant's conduct were extensively explored at the trial. The jury could not under the judge's ruling find Borden liable or responsible for Nicholson's crimes; but the jury could consider the reasonable inferences flowing from the evidence concerning Nicholson and Gallant in assessing Gallant's conduct and credibility and in reaching their ultimate determinations.
After Borden terminated the contract, DeMusz tried to continue in business. However, Borden did not give him enough business to support even one boat. DeMusz was quickly ruined.
After its change of management, Borden acted with a complete lack of concern for its agreements with DeMusz and his companies, and the dire effects on DeMusz of terminating them. Borden knew that its actions would destroy DeMusz. Borden knew *88 that DeMusz had encumbered himself with well over a million dollars in debt in order to enable Borden to make its Shuck-at-Sea project a success. Borden had even helped DeMusz to incur the debts by assuring the bank that DeMusz had contracts with Borden, had a solid, long standing ongoing business relationship with Borden and was engaged in a joint venture with Borden for which the financing was needed. Borden also knew what terminating the contract would do to DeMusz. As Booker wrote to Vice President Southwell of Borden in March of 1984: "If we terminate our agreement with him (DeMusz), he would have a hard time in making the payments on his boat."
However, Borden simply did not care what happened to its co-joint venturer. It mattered not to Borden that it had agreed that DeMusz was not to be responsible for the $125,000 advance. It mattered not to Borden that it had agreed that the $125,000 advance was not to bear interest. The promissory note extorted by Borden bore an unconscionable interest of six points above prime.
It mattered not to Borden that it was flagrantly violating contracts, agreements and understandings with its former employee and fleet manager who had faithfully served the interests of Borden for many years. Gallant made it clear in his deposition, that Borden gave no consideration at all to the plight of DeMusz. To Borden, a contract was a "mere scrap of paper." (See Chancellor Holloweg's infamous statement in 1914 regarding the Treaty guaranteeing Belgium's neutrality). The jury thought a contract was more than a scrap of paper. So should we.

IV

THE BROAD SCOPE OF THE COVENANT OF GOOD FAITH PERFORMANCE AND FAIR DEALING
The egregious misconduct of Borden violates a fundamental and nearly universal principle of contract law. In every contract there exists an implied covenant that each party will perform its obligations *89 in good faith, will act fairly and will refrain from actions which will destroy the "`fruits of the contract'" for its contracting partner. See Bak-A-Lum Corp. v. Alcoa Building Prod., 69 N.J. 123, 129-30, 351 A.2d 349 (1976). See also 2 Restatement (Second) of Contracts  205 (1981); 3A Corbin on Contracts  654A (1994 Pocket Part).
This principle embodies a recognition that bedrock in our law is the concept of fairness. The principle is especially applicable to undertakings in which one party has a superior bargaining position, or is in a fiduciary or quasi fiduciary relationship or engages in overreaching, coercion or other wrongdoing. See 2 Restatement (Second) of Contracts  205 (1981) and official comments thereto. The concept is an old one traceable to the writings of Cicero; however, the expansion of the principle has accelerated in recent years in accordance with the trend of the law to focus on fairness and justice rather than classical legal theory. See 3A Corbin on Contracts,  654A (D) and (E) (1994 Pocket Part).
The New Jersey Courts have consistently recognized and applied the covenant of good faith and fair dealing. As eloquently stated by Judge Arlin Adams in Schultze v. Chevron Oil Co.:
[D]uring the last generation, the courts of New Jersey have engaged in the explicit `development of those principles of equity, fair dealing, and good faith which breathed new life ÔÇö giving honesty into the bare contractual relationship' ... the naked terms of a contract, however explicit, were held not to constitute the final balance of the decision. New Jersey Courts instead judged contractual provisions against the demands of fair dealing and public policy.

[579 F.2d 776, 782 (3rd Cir.), cert. denied, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978) (Adams, J., dissenting) (emphasis added) (footnote omitted).]
In a leading case in New Jersey, Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 130, 207 A.2d 522 (1965), the New Jersey Supreme Court stated: "Where fairness and justice require, even though the parties to a contract have not expressed an intention in specific language, the courts may impose a constructive condition to accomplish such a result when it is apparent that it is necessarily involved in the contractual relationship."
*90 The Court quoted Justice Cardozo's statement that "`the law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be `instinct with an obligation', imperfectly expressed....'" See Brunetti, supra, 44 N.J. at 130, 207 A.2d 522.
In Rudbart v. North Jersey District Water Supply Comm'n, supra, 127 N.J. at 366, 605 A.2d 681, the Supreme Court said: "That principle of fair dealing pervades all of our contract law.... Although that principle will not alter the terms of a written agreement," giving plaintiff rights not found in the express language of the contract is not an alteration of the terms of the contract and is necessary in order to ensure that one party is not "`unjustly enriched, and the other unjustly impoverished on account of their dealings.'" In the present case, to require Borden to exercise its right of termination consistent with good faith performance and fair dealing is likewise not an alteration of the terms of the contract but rather a construction of the contract necessary to prevent unjust enrichment of Borden and unjust impoverishment of DeMusz.
The expansive scope of the covenant is described as follows in 2 Restatement (Second) of Contracts  205 (1981) and the official comments to that section: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." The good faith performance or enforcement of the contract "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving `bad faith' because they violate community standards of decency, fairness or reasonableness." Id.  205 comment a. Here, Borden was clearly unfaithful to the parties common purpose; Borden acted contrary to DeMusz's justified expectations; and Borden violated basic standards of decency, fairness, good faith and reasonableness.
*91 As stated further in the comments, the concept of fair dealing "may require more than honesty." Id.  205 comment d. Judicial decisions have recognized as bad faith "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Ibid. Here, Borden clearly evaded the spirit of the bargain, failed to cooperate and interfered with and frustrated the performance of the contract by DeMusz.
The comments to the Restatement indicate that the obligation of good faith "extends to dealing which is candid but unfair, such as taking advantage of the necessitous circumstances of the other party to extort a modification of a contract for the sale of goods without legitimate commercial reason." Id.  205 comment e. In addition, judicial decisions have recognized as types of violations the "abuse of a power to determine compliance or to terminate the contract." Ibid. (Emphasis added). Here, Borden took advantage of DeMusz's helplessness and extorted modifications in their contractual agreements. As found by the jury, Borden abused its power to terminate the contract.
The principle of good faith performance and fair dealing has been incorporated into the Uniform Commercial Code. Pursuant to N.J.S.A. 12A:1-203, "Every contract or duty within this act imposes an obligation of good faith in its performance or enforcement." Such good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealings in the trade." See N.J.S.A. 12A:2-103(1)(b). See also Lustrelon, Inc. v. Prutscher, 178 N.J. Super. 128, 143, 428 A.2d 518 (App.Div. 1981) ("Uniform Commercial Code imposes a general obligation of good faith in the performance or enforcement of every contract or duty within the statute"); Tele-Controls, Inc. v. Ford Indus., Inc., 388 F.2d 48, 51 (7th Cir.1967) (covenant of good faith performance is an "overriding provision that applies to the contract termination provisions" found in the Uniform Commercial Code).
*92 Professor Farnsworth, a reporter for the Restatement (Second) of Contracts, has defined the Code's good faith obligation as "an implied term of the contract requiring cooperation on the part of one party to the contract so that another party will not be deprived of his reasonable expectations." E. Allan Farnsworth, Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code, 30 U.Chi.L.Rev. 666, 669 (1963). Borden's conduct, after its change of management, was the antithesis of cooperation.
The New Jersey Supreme Court has applied the covenant of good faith and fair dealing in many different circumstances. In Association Group Life, Inc. v. Catholic War Vets. of United States, 61 N.J. 150, 293 A.2d 382 (1972), the defendant terminated plaintiff as an administrator of the defendant's life insurance plan and began to administer the plan itself. The Court said that the contract was not literally violated by the defendant's termination of plaintiff; however, a jury could find that there had been a breach of the covenant of good faith implied in all contracts. Id. at 153, 293 A.2d 382. The Court said that the conduct of the defendants "was not contemplated by the spirit of the contract and fell short of fair dealing." Id. at 154, 293 A.2d 382. So too was Borden's conduct here.
In Bak-A-Lum Corp. v. Alcoa Building Prod., supra, 69 N.J. at 129-30, 351 A.2d 349, the Court concluded that the agreement could be terminated without cause but disagreed with the trial court's assessment of seven months as an adequate period for notice of termination. The court found that twenty months was reasonable and allowed damages for loss of profits over that period. The Court reaffirmed its holding in Brunetti, supra, that the implied covenant could be breached even though a literal violation of the contract had not occurred. The court stated:

So, too, here. While the contractual relation of manufacturer and exclusive territorial distributor continued between the parties an obligation of reciprocal good-faith dealing similarly persisted between them. In such circumstances defendants selfish withholding from plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially *93 predicated upon its continuation constitutes a breach of the implied covenant of dealing in good faith . .. As such it must be given substantial weight in determining the reasonableness of a period of notice of termination of the distributorship.
[Id. at 130, 351 A.2d 349 (emphasis added).]
As in Bak-A-Lum, "so too here." It could be argued that Borden's termination of the contract was not a "literal violation" of the express terms of the contract. However, as found by the jury, Borden, while the contract was in effect, breached its "obligation" of fair dealing and good faith performance. That breach must be "given substantial weight in determining the reasonableness of a period of notice of termination...." Ibid.
Furthermore, the jury's calculation of the damages for the breach of the implied covenant is remarkably similar to the Supreme Court's calculation of similar damages in Bak-A-Lum. The Supreme Court awarded Bak-A-Lum an additional thirteen months of profits for the defendant's breach of the implied covenant of fair dealing and good faith performance in connection with the defendant's termination of the contract. In the present case, the jury awarded plaintiff an additional twelve month's profits for Borden's breach of the covenant of fair dealing and good faith performance in terminating the contract. The jury's calculation was reasonable and should be upheld. See infra at 103-105, 666 A.2d at 587-588.
In Pickett v. Lloyd's, 131 N.J. 457, 621 A.2d 445 (1993), the Court imposed a duty upon insurance carriers to exercise good faith and fair dealing in paying their insured's claims. The court said there should be a remedy for "`every substantial wrong"' and that insurers have a fiduciary duty to parties with whom they have a contractual relationship and must act in good faith and deal fairly in the resolution of claims. Id. at 471-72, 621 A.2d 445. Here, the parties characterized their undertaking as a joint venture. Supra at 74, 666 A.2d at 573. Courts have consistently applied high standards to persons engaged in a joint venture. The relationship between joint venturers is that of fiduciaries. See Silverstein v. Last, 156 N.J. Super. 145, 152, 383 A.2d 718 *94 (App.Div. 1978). The joint undertaking here does not fit all of the classic criteria of a joint venture. See Wittner v. Metzger, 72 N.J. Super. 438, 178 A.2d 671 (App.Div.), certif. denied, 37 N.J. 228, 181 A.2d 12 (1962). However, a joint venture need not assume a particular form nor be formally executed, and it may be implied wholly or in part from the acts and conduct of the parties. Id. at 444-45, 178 A.2d 671.
In any event, this joint undertaking was clearly not a traditional arms length contractual arrangement. DeMusz was helping Borden put into operation a project of great importance to Borden. DeMusz carried out his part of the bargain. Pursuant to the joint undertaking, in reliance on Borden's good faith and with the knowledge and encouragement of Borden, he saddled himself with enormous debts. Under these circumstances, Borden clearly had a fiduciary duty to act in good faith and deal fairly with DeMusz, its contractual partner. The jury by its verdict afforded plaintiff a fair remedy for Borden's "substantial wrong." See Pickett v. Lloyd's, supra, 131 N.J. at 471, 621 A.2d 445.
In Fitzmaurice v. Van Vlaanderen Mach. Co., 110 N.J. Super. 159, 163, 264 A.2d 740 (App.Div. 1970), aff'd, 57 N.J. 447, 273 A.2d 561 (1971), the contract provided that defendant could terminate the contract if it did not find plaintiff's work "profitable." To assure fairness, the court added other conditions to the literal language of the termination clause, namely that the defendant could only terminate the contract if he acted honestly and in good faith. Id.
In Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 181, 425 A.2d 1057 (1981), the Court said the nub of the case was whether implicit in the contract was a covenant obligating the "defendant to furnish residents with meaningful financial statements." The Court concluded that such a duty may be implied because it was necessary to give "`business efficacy'" to the contract as written. Id. at 182, 425 A.2d 1057. Permitting DeMusz to earn enough money under this contract to at least pay off the debts he incurred in making the Shuck-at-Sea project a *95 success, was at the nub of this joint undertaking. This income was necessary to give "business efficacy" to the contract.
Other jurisdictions have also construed the implied covenant liberally and applied it in diverse settings. The Supreme Court of Utah stated in St. Benedict's Development Co. v. St. Benedict's Hospital, 811 P.2d 194, 200 (Utah 1991), "an examination of express contract terms alone is insufficient to determine whether there has been a breach of the implied covenant of good faith and fair dealing." Further, "[t]he purpose, intentions and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties." Ibid. That is exactly what the jury and judge did in the present case.
The Utah Supreme Court also concluded that the obligation to act in good faith bars one party from making the performance of another party more difficult or impossible. Id. at 200. See also Power Systems & Controls, Inc. v. Keith's Electrical Const. Co., 765 P.2d 5 (Utah App. 1988). Making DeMusz's performance more difficult and finally impossible is precisely what Borden did in this case.
The court in United Roasters, Inc. v. Colgate ÔÇö Palmolive Co., 649 F.2d 985 (4th Cir.), cert. denied, 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981), dealt with an absolute unqualified right to terminate a contract. The jury found that Colgate acted in bad faith in exercising its right to terminate. The appellate court, in affirming the jury verdict for plaintiff quoted Dean Roscoe Pound's observation: "`[I]n civilized society, men must be able to assume that those with whom they deal in the general intercourse of society will act in good faith.' 3 R. Pound Jurisprudence 10 (1959)." Id. at 988.
The court in United Roasters said further that "[d]uring the last fifty years, a requirement of good faith dealing has emerged as a general principle of contract law. It is recognized in a majority of jurisdictions and in leading model codes." Id. at 988. The court continued by stating that there is:

*96 however, a substantial difference of opinion as to the application of the principle to unconditional rights of contract termination.... Perhaps the application should vary with the context. When termination is oppressive, when it would frustrate expectations reasonably held, though unsecured by express contractual agreements and when it will impose substantial losses upon the other party, application of the principle may well be called for; in other contexts, an exercise of an unqualified right of termination should best be left to a determination of his own best interest by the party possessing the right.
[Id. at 989 (citations omitted).]
The court in United Roasters concluded:
What is wrong with Colgate's conduct is not its failure to communicate a decision to terminate arrived at before the end of March, but its cessation of performance. Clearly, it had an obligation of good faith performance up until its right of termination was actually effective. The contract especially obliged it to use its best efforts in the promotion of Bambeanos. Instead of doing that, it simply ceased its performance ... Quite simply, it broke its contract when it terminated its performance, which was United Roasters' contractual due.
[Id. at 990.]
Borden ceased its performance long before it exercised the termination clause in the contract. Thus, as in United Roasters, this evidence of non-performance by Borden is proper evidence upon which to found plaintiff's bad faith termination claim. See United Roasters, supra, 649 F.2d at 991. See also B.E. deTreville, Jr. v. Outboard Marine Corp., supra, 439 F.2d at 1100; Busam Motor Sales v. Ford Motor Co., 203 F.2d 469 (6th Cir.1953); Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251 (1977).
In Scheck v. Burger King Corp., 756 F. Supp. 543, 549 (S.D.Fla. 1991), the court applied the covenant to actions by a franchisor which while not prohibited by the contract would destroy the fruits of the contract for the franchisee. Professors Cunningham and Jacobson said about the Scheck case: "There is not enough good to say about the analysis." 3A Corbin on Contracts  654A (1994 Pocket Part). The implied covenant, of good faith and fair dealing, should be used "to restrain the more powerful party from taking unfair advantage of the weaker." Ibid.
Other commentators have praised those decisions which in applying the covenant to the exercise of a right to terminate the *97 contract have emphasized fairness and flexibility to the end that the non-terminating party will not be deprived of reasonable expectations or otherwise mistreated. See Professor Robert A. Hillman, An Analysis of the Cessation of Contractual Relations, 68 Cornell L.Rev. 617 (1983), and the numerous authorities cited therein.
Commentators have also recognized that the implied covenant of good faith may supply missing terms consistent with the parties' "reasonable expectations"; for example, if one party's performance, as here, required long term efforts and substantial monetary expenditures before that party could realize the fruits of the contract. T. Mark Mclaughlin and Caryn Jacobs, Termination of Franchises: Application of the Implied Covenant of Good Faith and Fair Dealing, 7 Franchise Law Journal 1, 19 (Summer 1987). See also Florida ÔÇö Georgia Chem. Co. v. National Lab., Inc., 153 So.2d 752 (Fla.App. 1963).
A case illustrating the factual nature of the inquiry is Careau and Co. v. Security Pacific Business Credit, Inc., 222 Cal. App.3d 1371, 272 Cal. Rptr. 387 (1990). The court said that to recover for a breach of the implied covenant of good faith and fair dealing, the claimant must show:
that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement. Just what conduct will meet this criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties.

[Id. 272 Cal. Rptr. at 399-400 (emphasis added).]
The trial judge in the present case followed these principles by advising the jury correctly as to the applicable principles of law and letting the jury find the facts.
The majority in reversing the jury's finding of a breach of the covenant of good faith and fair dealing relies on those cases which indicate that when the right to terminate a contract is absolute under the clear wording of the agreement, then the motives of the *98 party in terminating the contract are irrelevant. See Karl's Sales and Serv. v. Gimbel Bros., 249 N.J. Super. 487, 495, 592 A.2d 647 (App.Div.), certif. denied, 127 N.J. 548, 606 A.2d 362 (1991). The majority then jumps from this conclusion to a broad holding that if the right to terminate is "absolute," the covenant cannot "override" the right to terminate. See majority opinion at 49-54, 666 A.2d at 560-563.
The cases the majority relies on usually involve contracts which unlike the present one, are integrated and expressly provide that the contract may be terminated without cause or for any reason. See Custom Communications Engineering Inc. v. E.F. Johnson Co., 269 N.J. Super. 531, 535, 636 A.2d 80 (App.Div. 1993) (contract allowed for termination "with or without cause"); Corenswet, Inc. v. Amana Refrigeration, Inc., 594 F.2d 129 (5th Cir.), cert. denied, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979) (contract terminable "at any time for any reason"); Frank Lyon Co. v. Maytag Corp., 715 F. Supp. 922 (E.D.Ark. 1989) (contract construed to be terminable without cause); Highway Equip. Co. v. Caterpillar, Inc., 707 F. Supp. 954 (S.D.Ohio 1989), aff'd, 908 F.2d 60 (6th Cir.1990) (contract expressly provided for termination without cause); Blalock Mach. v. Iowa Mfg. Co., 576 F. Supp. 774 (N.D.Ga. 1983) (parties understood contract could be terminated with or without cause); Borbely v. Nationwide Mut. Ins. Co., 547 F. Supp. 959 (D.N.J. 1981) (contract terminable without cause).
However, even in cases of an "absolute" unqualified right to terminate, the courts often qualify their holdings regarding the impact of the implied covenant on the right to terminate. For example, in Cardinal Stone Co. v. Rival Mfg. Co., the court stressed that the parties were experienced business men and that plaintiff could not represent itself as the "victim of sharp business practices." 669 F.2d 395, 396 (6th Cir.1982). See also Triangle Mining Co. v. Stauffer Chemical Co., 753 F.2d 734, 740 (9th Cir.1985) (where right to terminate is "absolute," motive in termination is irrelevant if there is no special element of reliance or unequal bargaining power); Grand Light & Supply Co. v. Honeywell, *99 Inc., 771 F.2d 672 (2d Cir.1985) (court implied that for a good reason the covenant would override explicit contractual terms e.g., reasons such as special reliance, unequal bargaining power, or a party inexperienced in business).
The majority relies on and quotes from Corenswet, Inc. v. Amana Refrigeration, Inc., in which the court interpreted Iowa law. The case is readily distinguishable. The termination clause in Corenswet specifically authorized termination "at any time for any reason" on 10 days notice. Corenswet, Inc., supra, 594 F.2d at 131. The issue was whether the termination could be barred by an injunction, not whether the non terminating party had a claim for damages. As to damages, the court indicated that a remedy at law would be available despite the language of the contract. Id. at 139. Furthermore, the decision in Corenswet has been extensively criticized as seemingly "incorrect" and as ignoring "common law and Code precedent and numerous commentaries that repudiate the `plain meaning' approach to [construction of the termination clause]." See Hillman, supra, 68 Cornell L.Rev. at 647-48 n. 196-98.
The majority's reliance on Borbely is also misplaced. In Borbely, the court distinguished the Bak-A-Lum decision of the New Jersey Supreme Court as a case in which the party to an agreement had committed some "unconscionable act which served to deprive the other party of the contemplated fruits of their agreement." See Borbely, supra, 547 F. Supp. at 973. Here, Borden committed numerous unconscionable acts which deprived DeMusz of the contemplated fruits of their agreement. The court in Borbely also found there was no evidence of sizable expenditures or assumption of additional obligations in reliance on the continued existence of the contract. Id. at 974. Such evidence permeates the present case.
The majority also relies on Glenfed Fin. Corp. v. Penick Corp., 276 N.J. Super. 163, 175, 647 A.2d 852 (App.Div. 1994), certif. denied, 139 N.J. 442, 655 A.2d 444 (1995). However, in that case the creditor's actions were honest in fact, commercially reasonable, *100 not in "bad faith," and not in pursuit "of its own economic interests unrelated to obtaining the repayment of the loan." Id. at 178, 647 A.2d 852. Here, the record in the light of the jury's verdict compels converse conclusions.
Furthermore, this case does not involve a contract which expressly provides for an "absolute" right to terminate. The contract does not specifically provide that it may be canceled without cause or for any reason. The language is simply that "[e]ither party may cancel this contract by giving prior notice of such cancellation in writing ninety (90) days prior to the effective cancellation date." In the case of Gianelli Distrib. Co. v. Beck & Co., 172 Cal. App.3d 1020, 219 Cal. Rptr. 203, 209 (1985), the contract had a similar clause. The court said that the evidence was sufficient to establish that the agreement was not integrated and that an issue of fact was created as to whether a good cause termination requirement was an implied term of the contract. Id. 219 Cal. Rptr. at 211-12. The court said an agreement which "`may be terminated at any time by either party, by giving the other sixty days notice,' could reasonably be interpreted as referring only to the duration of the agreement and not the permissible reasons for its termination, since the clause does not expressly state whether good cause is a prerequisite." Id. at 212 (citation omitted).
Likewise, in Sherman v. Mutual Benefit Life Ins. Co., 633 F.2d 782, 783 (9th Cir.1980), the language of the agreement was that "[t]his agreement may be terminated at any time by either party, by giving the other sixty days' notice to that effect; or it may be terminated immediately by the company if in its judgment its interest so require." The court said that in determining whether the language "could reasonably be interpreted as including a prerequisite of good cause," the court must consider the circumstances "including the object, nature and subject matter" of the contract. Id. at 784 (citation omitted). The court further said that "[i]n light of the nature of the position, and the importance to Sherman of its long-term prospects, we cannot agree with the *101 district court's conclusion that the termination clause is not reasonably susceptible to an interpretation requiring good cause for termination." Ibid.
In Randolph v. New England Mutual Life Ins. Co., 526 F.2d 1383 (6th Cir.1975), the plaintiff, a general insurance agent, contended that the defendant insurance company had improperly terminated the general agency contract between the parties. The contract specifically provided that "`each of the parties hereto shall have the right to terminate the agency at any prior time upon giving sixty days' notice in writing.'" Id. at 1385. The court construed that language to mean that the termination could be "without cause" but could not be in "bad faith." Id. at 1386. The court held that a fact issue was present as to whether the company acted in bad faith. Id. at 1387. See also B.E. deTreville v. Outboard Marine Corp., supra, 439 F.2d at 1100; Clausen & Sons, Inc. v. Theo. Hamm Brewing Co., 395 F.2d 388, 391 (8th Cir.1968); Rees v. Bank Bldg. and Equip. Corp., 332 F.2d 548 (7th Cir.), cert. denied, 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964); Zimmer v. Wells Management Corp., 348 F. Supp. 540 (S.D.N.Y. 1972); Gambar Enterprises, Inc. v. Kelly Services, Inc., 69 A.D.2d 297, 418 N.Y.S.2d 818 (1979); Paradee Oil Co. v. Phillips Petroleum Co., 320 A.2d 769 (Del. Ch. 1974), aff'd, 343 A.2d 610 (Del. 1975) (claim under implied covenant of fair dealing upheld when a supplier induced plaintiff to invest resources and credit in establishing a costly distribution facility for supplier's product only to have the contract unreasonably terminated without giving plaintiff an opportunity to recoup his investment).
Furthermore, the overall conduct of the terminating party is an important factor in determining the effect of the covenant on the exercise of a power to terminate the contract. "A party who has reserved a power of termination loses that power if he himself commits such a breach as goes to the essence and discharges the other party. A subsequent notice of termination has no effect upon the other party's right to full damages for the existing total breach." (Emphasis added). 6 Corbin on Contracts  1266 *102 (1962); see also Coastal Oil Co. v. Eastern Tankers Seaways Corp., 29 N.J. Super. 565, 577, 103 A.2d 26 (App.Div. 1954); McGinnis Piano and Organ Co. v. Yamaha Int'l Corp., 480 F.2d 474, 479 (8th Cir.1973); Merando v. Mathy, 152 F.2d 21 (D.C.App. 1945), cert. denied, 327 U.S. 804, 66 S.Ct. 966, 90 L.Ed. 1029 (1946).
In any event, an "absolute" right to terminate a contract is not a license to do wrong. In Hall v. Farmers Ins. Exchange, 713 P.2d 1027, 1030 (Okla. 1985), the court said "the implied covenant of good faith extends to a covenant not to wrongfully resort to the termination at will clause." The issue is one "of fact to be decided by the jury." Ibid. See also Three D Departments, Inc. v. K Mart Corp., 670 F. Supp. 1404, 1408 (N.D.Ill. 1987) (K Mart was obligated to exercise in good faith its power to terminate); Bank of Indiana, Nat'l Ass'n. v. Holyfield, 476 F. Supp. 104, 109 (S.D.Miss. 1979) (the obligation of good faith and fundamental fairness in the performance of every contract "is so pronounced that courts have the power to refuse to enforce any contract or limit the application of any clause therein in order to avoid an unconscionable result"); Straup v. Times Herald, 283 Pa.Super. 58, 423 A.2d 713 (1980) (a right to terminate at will may be equitably estopped).
The following may be distilled from the abundant legal precedent. (1) The implied covenant of good faith performance and fair dealing is a fundamental precept of American jurisprudence. The covenant is found in every contract and applies to every aspect of the contract. (2) If a party has an absolute right to terminate the contract without cause or reason, the motive of the party in terminating the contract is irrelevant. However, the existence of a right to terminate a contract does not abrogate the covenant of good faith and fair dealing or furnish absolution or insulation to one who breaches the covenant. This is especially true when the parties are in unequal bargaining positions, when there is justifiable reliance upon the continuation of the contract or when one party acts in a wrongful fashion. (3) Whether the covenant has been breached is essentially a factual question dependent upon *103 consideration of many factors including the reasonable expectations of the parties, and their conduct in the course of the performance of the contract.
The jury verdict in this case fully accords with these principles. Borden should not be permitted to escape the consequences of its wrongdoing by the cloaking of its misconduct with the euphemism of "commercial practices." See majority opinion at 57, 666 A.2d at 564.

V

DAMAGES
Borden challenges the jury's award of damages for the breach of the implied covenant. The damage verdict was in two parts. Plaintiff had sought damages in the amount of $326,272 for lost profits during the period the contract was in force. The lost profits were those which resulted from Borden's breach of the express terms of the contract. The breach was Borden's failure to buy the amount of clams specified in the contract and Borden's failure to pay the market price set forth in the contract. The jury found that Borden had so breached the contract and awarded plaintiff the amount it sought.
Plaintiff also sought damages of approximately $1,500,000 for lost profits arising out of Borden's breach of the covenant of good faith and fair dealing. The jury awarded plaintiff the sum of $412,000. The evidence clearly indicates that this sum represented plaintiff's lost profits for a period of one year after Borden had terminated the contract.
Borden argues that once the jury found that Borden could terminate the contract, then lost profits after termination could not be recovered. I disagree. The trial judge also disagreed. The jury asked the judge if damages for a breach of the implied covenant could be awarded for a period after the termination of the contract. The judge, after conferring with counsel, responded *104 that they could be so awarded. Borden did not object to the judge's response.
The trial judge's response to the jury was clearly correct. A party who breaches a contract, including a breach of the implied covenant of good faith performance and fair dealing, is liable for the "natural and probable consequences of the breach." See Pickett v. Lloyd's, supra, 131 N.J. at 474, 621 A.2d 445. The damages are intended to put the injured party in the same position as if the contract had not been breached. Ibid. See also the Uniform Commercial Code N.J.S.A. 12A:1-106(1) which provides that its remedies "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed."
Thus, damages for the breach of the implied covenant of good faith performance and fair dealing may be recovered for the "expectations" which a party "anticipated under the contract." Noye v. Hoffmann-LaRoche, Inc., 238 N.J. Super. 430, 437, 570 A.2d 12 (App.Div.), certif. denied, 122 N.J. 146, 147, 584 A.2d 218 (1990). If Borden had not breached the implied covenant of good faith and fair dealing, plaintiff could have reasonably expected profits from the venture. The contract had three or more years to run. The jury's award of only one year's additional profits is a reasonable and fair estimate of "expectation" damages. See also supra at 93-94, 666 A.2d at 582-583 and Bak-A-Lum Corp. v. Alcoa Building Prod., supra, 69 N.J. at 130, 351 A.2d 349.

VI

CONCLUSION
Reversing this jury verdict is a miscarriage of justice for Donald DeMusz. However, much more is involved. The majority's decision has far reaching and unfortunate ramifications. Increasing global competition puts fresh strains on business probity. This does not mean that our society must surrender to a philistine philosophy of "anything goes in business." Justice Jacobs observed *105 forty years ago that the "tendency of the law, both legislative and common, has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade." See Adolph Gottscho, Inc. v. American Marking Corp., 18 N.J. 467, 475, 114 A.2d 438, cert. denied, 350 U.S. 834, 76 S.Ct. 69, 100 L.Ed. 744 (1955).
New Jersey continues to be in the forefront of that advance toward higher standards of fairness and commercial morality. Judge Adams pointed out:
The New Jersey Courts thus no longer conceive of a contract solely as a private treaty in a bellicose state of nature, conferring privileges to be used at will out of avarice, pique or spite. Rather, a contract, particularly one involving a long-term relationship which places the welfare of one party in the hands of the other, is understood to reflect the ethical tenor of the society within which the contract is formed, and creates the expectation that the powers it grants will be reasonable and equitably exercised. The law of New Jersey protects such expectations.

[Schultze v. Chevron Oil Co., 579 F.2d 776, 784 (3rd Cir.), cert. denied, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978) (Adams, J., dissenting) (emphasis added) (footnotes omitted).]
See also G. Richard Shell, Contracts in the Modern Supreme Court, 81 Cal.L.Rev. 433, 446 (1993); Nicola W. Palmieri, Good Faith Disclosures Required During Precontractual Negotiations, 24 Seton Hall L.Rev. 70, 73 (1993).
In this case, Borden, holding and wielding vastly superior bargaining power treated its much weaker contractual partner in a callous, ruthless, and unconscionable manner. Borden's cynical abuse of its power was demonstrated by the following exchange. When Gallant handed DeMusz the notice of termination, DeMusz protested that he had a contract. Gallant responded that he had a "room full of lawyers."
DeMusz was totally ruined by Borden's actions. We should do more than refrain from applauding Borden's "commercial practices." See majority opinion at 57, 666 A.2d at 564. We should uphold the jury's condemnation of them.
I would affirm.
NOTES
[1] The Maine meeting between DeMusz and Gallant undoubtedly took place on May 5, 1986, evidenced by an inter-company memorandum from Gallant to Southwell, dated May 13, 1986, which reads as follows:

Per our conversation this morning I am forwarding copies of Don DeMusz's loan papers. Please note reference to a contract (also enclosed) obligating Borden to purchase 7680 bushels per week from Don's new boat the Son's of Thunder. I had no knowledge of this contract until May 5th.
[Emphasis added.]
[2] We emphasize that neither Sea Labor, Inc., and Sea Work, both of which are New Jersey corporations, nor DeMusz, were parties to this action and, therefore, any claims that they may have had against Borden could not be asserted in this action.
[3] We are constrained to note that the written proposal by DeMusz to the bank quoted in the dissent indicated that Sea Labor, not Sons of Thunder, was going to borrow the money in furtherance of the contract between Sea Work and Borden regarding the shuck-at-sea project. It was Sea Labor's charter arrangement with Borden, not the Borden contract with Sons of Thunder, that Gallant wrote to the bank about in the letter quoted in the dissent. In writing about that relationship, it certainly cannot be said that Gallant was making any misrepresentations about Borden's relationship with Sons of Thunder.